[No. S016924. July 18, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
KURT MICHAELS, Defendant and Appellant.

**COUNSEL**

Harry M. Caldwell and Karen L. Landau, under appointments by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson and David P. Druliner, Chief Assistant Attorneys General, Gary W. Schons, Assistant Attorney General, Robert M. Foster, Laura Whitcomb Halgren, Keith I. Motley and Bradley A. Weinreb, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KENNARD, J.**—A jury convicted defendant Kurt Michaels of the first degree murder of JoAnn Clemons (Pen. Code, § 187),[1] as well as robbery of Clemons (§ 211) and burglary of her apartment (§ 459). The jury found that defendant personally used a knife in all three crimes (§ 12022, subd. (a)), and personally inflicted great bodily injury on Clemons (§ 12022.7). It also found four special circumstances: (1) intentional murder for financial gain (§ 190.2, subd. (a)(1)); (2) murder during the commission of robbery (§ 190.2, subd. (a)(17)(A)); (3) murder during the commission of first degree burglary (§ 190.2, subd. (a)(17)(G)); and (4) murder while lying in wait (§ 190.2, subd. (a)(15)). The jury fixed the punishment as death. The trial court denied defendant's motions for new trial and modification of sentence. It sentenced defendant to death for the murder and to six years each for the robbery and the burglary. The sentence on the enhancements was stayed.

Defendant's appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

## I. Guilt Phase Evidence

### A. *Introduction*

Defendant did not dispute that he murdered JoAnn Clemons shortly after midnight on October 3, 1988. We therefore present only a condensed version of the extensive prosecution evidence of defendant's guilt.

---

[1] Unless otherwise indicated, all statutory citations are to the Penal Code.

Because defendant's guilt of murder was not contested, the issues at the guilt phase of the trial were the degree of the murder, defendant's guilt of the charges of burglary and robbery, and the truth of the alleged special circumstances. The trial centered on defendant's motive for killing JoAnn Clemons. Defendant claimed he killed her to protect Christina, JoAnn's 17-year-old daughter, who was defendant's girlfriend. He said Christina told him that her mother had frequently abused her sexually and physically, and that she would commit suicide if the abuse continued. Christina said the only solution was for defendant to kill her mother, and defendant did so. The prosecution, on the other hand, contended that defendant killed JoAnn to steal JoAnn's property and to allow Christina, JoAnn's daughter, to collect the proceeds of JoAnn's life insurance policy.

### B. *Events Preceding the Murder*

Defendant, known as "Moccasin Kurt" from the moccasins he wore, was 22 years old on the date of the murder. After finishing high school he served for three and one-half years in the Marines, receiving a psychiatric discharge in 1987. Since leaving the Marines defendant had not been employed, living on income from drug sales and other illegal activities.

Defendant was married briefly in 1985-1986 and had one child. In February 1987, he met 16-year-old Christina, who became his girlfriend. On the date of the murder Christina was confined at Broad Horizons, an adolescent rehabilitation facility, where she had been sent after being arrested for illegal possession of a concealed weapon.

JoAnn Clemons, Christina's mother, had an apartment in Escondido. Her life was insured for $10,000, with an additional $10,000 for accidental death. Under the terms of the policy murder would be considered an accidental death. Her daughter Christina was the only beneficiary.

In September of 1988 Christina was released on a weekend pass from Broad Horizons and stayed with her mother. During that weekend Christina obtained a key to the apartment from the building manager. She was released again on a weekend pass on September 29 and met with defendant. She told him she wanted her mother killed, and they discussed how to do it.

In the fall of 1988, defendant, Mark Herbert, Darrin Popik, and Kimberly Platt were staying at the Oceanside apartment of Velinda Davis. On September 30, four days before the murder, Velinda Davis heard defendant tell Christina, "Now we can knock off the old lady." Christina replied, "And then we can get the money." That evening, defendant asked Mark Herbert if

he wanted to go to Escondido to do a "tax." (At trial, Herbert explained that a "tax" refers to collecting a debt plus something extra—the "tax." The collection process usually involves force or the threat of force.) Defendant offered Herbert one-third of the proceeds, and Herbert agreed to participate. The same day defendant told Kimberly Platt he was going to "tax" an old lady in Escondido who had been interfering too much in the lives of defendant and Christina.

On October 1, Mark Herbert and Darrin Popik arranged for Joseph Paulk to drive the getaway car. Before they picked up defendant, however, Herbert decided not to participate in the crime. Defendant and Popik left, telling Velinda Davis they were going to Escondido to tax someone. After they left, Davis noticed that one of her kitchen knives was missing.

### C. *Prosecution Evidence of the Killing*

Shortly after midnight on October 3, 1988, JoAnn's neighbors, Annette Morton and Laurie Roberts, heard sounds of a struggle and called the police. When the police arrived, another neighbor, Kimberly Anderson, described two men she had seen in the hallway walking toward JoAnn's apartment. Neighbor Dennis Merling saw a man, later identified as Popik, climbing over a balcony and walking across the apartment building's parking lot.

Police broke down the door of JoAnn's apartment and discovered her body on the bedroom floor. An autopsy showed numerous stab wounds and blunt force injuries to the head. Two stab wounds to the neck were fatal.

### D. *Prosecution Evidence of Actions After the Murder*

Police caught Popik near the apartment complex and arrested him. Kimberly Anderson identified him as one of the persons she had earlier seen in the hallway of the apartment building.

Defendant escaped and returned briefly to Velinda Davis's apartment. He then went to the Marine barracks at Camp Pendleton to visit two acquaintances, Rodney Hatch and Leon Madrid. He told Hatch he had sliced a woman's throat. Madrid and two other people present, Kimberly Buckhalter and Dennis Lucas, saw defendant indicate by gesture that he had killed a woman by cutting her throat.

When Madrid saw defendant again a week later, defendant mentioned he was working at a carnival in Oceanside. On October 17, 1988, police arrested defendant at the carnival.

E. *Defendant's Confession*

Defendant confessed immediately after his arrest. He said he made a living by collecting debts, gathering information, and "adjusting attitudes."

Defendant said that Christina, his girlfriend, had just been released from Broad Horizons, an adolescent rehabilitation facility. She told him she would have to live at home for six months and could not handle it, and would kill herself. She said that JoAnn, her mother, had frequently abused her, sometimes sexually. Defendant feared that if Christina had to return home she would resume using drugs and alcohol.

Defendant said Christina told him she thought the only solution to her situation was to kill JoAnn. Defendant had tried many times to get Christina to consider alternatives, but Christina was not willing to testify against her mother or describe the sexual acts between her and her mother. Defendant assured Christina he would kill JoAnn. He recruited Popik by promising that Popik could take whatever was in JoAnn's apartment. He promised Paulk, the driver of the getaway car, $200.

Defendant told the police he had used one-quarter gram of methamphetamine before the murder. He and Popik waited for two to three hours outside the apartment. He said they were waiting for Paulk to arrive and for JoAnn to go to sleep so the killing would be less noisy. Defendant used Christina's key to enter JoAnn's third floor apartment. When he entered the bedroom defendant tripped, waking JoAnn. Popik "went ballistic." He tried to flee, but when defendant pushed him back, Popik began hitting JoAnn in the face. Defendant stabbed JoAnn in the back but the knife broke. Popik went into the kitchen and returned with another knife, which he gave to defendant. Defendant then cut JoAnn's throat.

When police arrived and began knocking on the front door, defendant told Popik to get out. Defendant himself escaped by way of the apartment's balcony. Defendant went to Paulk's car and they left. During the trip defendant threw away a knife and his moccasins. He did not take anything from the apartment.

Before the killing, defendant had told Popik that JoAnn had $100,000 in insurance coverage,[2] and that the money would help him and Christina to get a start. In his confession defendant said he actually did not know what insurance JoAnn had, but he thought it would probably be about $100,000. He promised Popik $2,000 to $5,000 from the life insurance proceeds.

---

[2]JoAnn had a $100,000 insurance policy, but on the life of her ex-husband.

Defendant told the detectives that he killed JoAnn not for the insurance money, but "so Christina would not have to go back with her mother." But later, in an unrecorded conversation with the detectives, defendant acknowledged that the life insurance proceeds were a secondary benefit of the killing because Christina wanted to go to a mechanics school in Arizona and needed $9,000.

Defendant later prepared and signed a statement saying he killed JoAnn so that Christina would not be forced to live with her mother and "revert to her old habits and problems."

### F. Defense Evidence

Christina was the only defense witness. She described various incidents of physical and sexual abuse by her mother. She said her mother beat her with belts, cords, and wood; kicked her in the face, knocking out her front teeth; and threw her through a glass sliding door. The sexual abuse included digital penetration, beginning at a very early age, and oral copulation beginning at age nine. Christina reported the abuse to the social service department, but got no help. She became depressed, cut herself with knives, and attempted suicide several times.

When Christina was 16 she and defendant went to Texas. After they ran out of money they returned to San Diego. There she was arrested for possession of a concealed weapon and sent to Broad Horizons. She told the therapists at Broad Horizons that her mother had abused her, but her therapist wanted to reunite the family and arranged for Christina to return home for overnight visits.

During a weekend visit early in September of 1988, JoAnn struck Christina with a cast iron pan and engaged in digital penetration and oral copulation. When Christina came home on the weekend of September 15, JoAnn choked her until she consented to sexual penetration. The next day Christina told defendant that she would have to live at home for the next six months. (This was not true; she would be living at Broad Horizons and only be home on occasional weekend passes, but she said it to give defendant an incentive to kill JoAnn. She said she had tried to poison JoAnn but failed.)

On September 30, 1988, Christina again told defendant she wanted her mother killed, and suggested cutting her mother's throat. She said if JoAnn were not killed, she would commit suicide.

The prosecution attacked Christina's credibility. She admitted lying to JoAnn in the past and telling lies to the police. She acknowledged lying to

defendant when she said she would be forced to live with her mother for six months. She lied to her therapist when she said she and defendant owed a large drug debt and were in personal danger. She liked to talk about violent acts, and to make up stories about violent acts. She had sold illegal drugs, was fond of knives, and had been arrested for illegal possession of two knives. She admitted manipulating defendant into doing things.

Christina denied knowing that JoAnn had life insurance, or telling the police that defendant had said JoAnn was insured. She did not recall telling defendant that "we can get the money," as Velinda Davis had testified.

## II. PENALTY PHASE EVIDENCE

Defendant had no prior felony convictions. The prosecution, however, put on evidence of several prior incidents of threatened violence.

On August 30, 1988, Marine Sergeant Chad Fuller was in his apartment and showed a pellet gun to a man known as Chuck. Chuck left with the gun, but returned a few minutes later without the gun, accompanied by defendant, Mickey Davis, and Davis's girlfriend. Chuck then left the apartment. Defendant pulled out a pistol and pointed it at Fuller. When Davis learned Fuller was a Marine, however, he apologized and went out to retrieve the gun. Meanwhile, defendant told Fuller that defendant made a living by taking contracts to get people's property back, and that he was training Davis. Davis returned with the pellet gun, and handed it to Fuller. Defendant told Fuller not to call the police or he would cut Fuller into little pieces. Defendant left a note for Chuck, and signed it "Moccasin Kurt." Defendant then left with Davis and Davis's girlfriend.

Two weeks later Fuller saw defendant, Chuck, and another man on his balcony. Defendant said, "It's tax time." He said it had cost Chuck $100 to get the pellet gun back, so he wanted the gun. All three men had knives; defendant also had a gun. They followed Fuller into the apartment, and took the pellet gun, two shotguns, and other property. The next day someone returned one of the shotguns to a neighbor, who gave it to Fuller. Several days later defendant returned some of the other property.

Oceanside Police Officer Peter Coppick testified that on August 31, 1988, he arrested defendant for having a concealed and loaded handgun in a parked pickup truck. A few months later, on January 23, 1988, Officer Coppick arrested defendant and Christina for illegal possession of knives.

Texas Police Officer Frederick Schroyer testified that on November 12, 1987, he had detained defendant as a possible vandalism suspect and discovered that he had two knives—a seven-inch doubled-edged blade and an eight-inch blade. Both were illegal in Texas.

Joseph Toy, a neighbor during defendant's high school years, testified that when defendant was 14 or 15 he went joyriding in defendant's mother's car and was in an accident. Defendant then broke into Toy's house, took two guns, and stole a 1969 Mustang from the driveway. Defendant later apologized and returned all the property to Toy. Defendant did yard work and other jobs to pay for the damage he had caused to Toy's car.

Michael Brohammer, a high school friend, testified that one day defendant showed him a gun concealed under defendant's pant leg.

The prosecution concluded its penalty phase case by playing the portion of the recording of defendant's confession that had not been presented at the guilt phase. This portion involved defendant's claim to have committed 10 to 15 contract killings. Later in the interview, however, defendant said the murder of JoAnn was the first that was premeditated and the first for other than self-defense.[3] Dennis Lucas, who had testified in the guilt phase to defendant's statements at the Camp Pendleton barracks regarding the murder, returned to the stand to testify that at the time of the conversation defendant had a "hit list."

Defendant's sister, Cheryl, and his mother, Barbara, described defendant's childhood. Defendant's father, Lynn Miller, was a violent alcoholic who beat defendant and his mother, who sexually abused Cheryl and who hated defendant. Barbara testified that Miller didn't want another male in the house besides himself. "I couldn't let him [Miller] be alone with the baby."

When defendant was three years old, he and his mother saw Miller sexually molest six-year-old Cheryl. After Miller separated from Barbara, he continued to harass the family, and they moved frequently to avoid him. He tried to run over the children with his car and to kidnap them.

Barbara said that after she left Miller, she had "slime boyfriends." Defendant nevertheless became attached to one of them, Danny, who was a member of a motorcycle gang. Shortly after Barbara broke up with Danny, defendant's maternal grandmother died. Defendant, then age 11, attempted suicide.

In 1979, when defendant was 13 years old, his mother was raped. Defendant was devastated and felt he had failed to protect her.

The next year his sister Cheryl was raped. Barbara described defendant's response: "Just volatile. He was so angry, he was close to insane." He

---

[3]The evidence was offered as proof of defendant's mental state in connection with the charged murder, not for the truth of his commission of other homicides. No other evidence was presented to show that defendant had committed any other homicide, whether or not premeditated or in self-defense.

considered it his responsibility to protect his sister and mother, and any woman who was being abused.

Both defendant's mother and sister said defendant tended to brag about things that had not happened to protect his image as a strong and dangerous person. Cheryl said, "I believe a lot of what he told the police was blown up so that he could be tough." Michael Brohammer, defendant's high school friend, also said that defendant fantasized and tended to exaggerate. Terri Cook described defendant's positive influence on her addicted son. She believed defendant saved her son's life by getting him to leave the community where he had drug connections.

Carol Drukee, who was Christina's foster mother for a time, gave positive testimony as to defendant's character. She also testified that when JoAnn Clemons would visit, she saw JoAnn engage in sexually inappropriate behavior with Christina.

Dr. Bruce Hubbard, a clinical psychiatrist at the University of California at San Diego, examined defendant and Christina. He described defendant as suffering from a major depressive disorder, and mixed personality disorder with depressive, dependent, antisocial, and borderline features. Defendant's attempted suicide at the age of 11 was indicative of extreme emotional disturbance. Defendant also had mild or minimal brain dysfunction, probably from use of methamphetamine or from an injury in an auto accident.

Dr. Hubbard testified that he did not believe defendant had an antisocial personality disorder. Defendant was able to relate closely to other persons and have intense feelings for someone else, which is not possible for someone with an antisocial personality. Dr. Hubbard concluded that JoAnn's sexual abuse of Christina was the key motivating factor in defendant's murder of JoAnn. Defendant saw himself as a protector of abused women and children. When defendant met Christina, he assumed responsibility for protecting her.

Dr. Hubbard also met with Christina and reviewed her psychological and juvenile records, as well as the transcript of her murder trial. He found Christina suffered from both a major depressive disorder and severe borderline personality disorder, the result of repeated sadistic abuse by her mother. He explained that a "borderline personality" is one that appears to be neurotic, but on deeper examination has psychotic features. Christina had a superior intelligence quotient (IQ) of 138-141, in contrast to defendant's IQ of 91, and in his view was able to control and manipulate defendant.

Dr. Hubbard also reviewed JoAnn's psychiatric records, which in his opinion revealed manic-depressive illness, alcoholism, and a severe mixed

personality disorder with histrionic and sadistic features. Combined, the personality disorders of JoAnn, Christina, and defendant would result in "disaster, catastrophe, and chaos."

The prosecution called Christina as a rebuttal witness. She acknowledged that she had told the psychiatrist who examined her in connection with her juvenile court prosecution about incidents in which defendant had hurt her. On cross-examination, Christina said she and defendant enjoyed violent sex. Some of the acts she had described to the psychiatrist did not happen, and others were consensual.

### III. GUILT PHASE ISSUES

### A. *Admissibility of Defendant's Confession*

#### 1. *Background*

Detectives Allen and Gaylor interrogated defendant at the Oceanside police station shortly after defendant's arrest:

ALLEN: "This is Kurt Michaels [defendant]. No middle name."

GAYLOR: "Kurt, what's your middle name? None."

DEFENDANT: "Legal [name is] changed for the third time."

GAYLOR: "Where does your family live, Kurt?"

DEFENDANT: "Who knows honestly? I wish I knew or I'd be with them now. I'd be able to get the other pictures in my other coat."

GAYLOR: "Well, I'll tell you. I've been doing this for about twelve years. John's been doing this for about thirteen years, here. And a couple of years with the San Diego Police before that. And a few years with the Highway Patrol before that. And if there's one thing we know, it's that there's always more than one side to every story. So what we want to do is provide you with an opportunity to tell your side of the story, because this last two weeks, we've been talking with a lot of different people and have gotten a lot of different information from different people."

DEFENDANT: "You found out I am a mental case. (Laughter.)"

GAYLOR: "So, now it's your turn to tell your side of the story. Okay? Also, if you have any questions, it will be your opportunity to ask them, all

right? Before we do that, though, I want to read you your rights. [Reads standard *Miranda* warnings.] Do you understand each of these rights I've explained to you? (Defendant nods his head yes.) Is that yes?"

DEFENDANT: "Yes."

GAYLOR: "Okay. Having in mind and understanding your rights as I've told you, are you willing to talk with us?"

DEFENDANT: "Sure. No problem."

GAYLOR: "Do you know why you're here?"

DEFENDANT: "Yes."

GAYLOR: "Tell me, in your own words."

DEFENDANT: "Murder."

GAYLOR: "Murder of who?"

DEFENDANT: "Murder of JoAnn Clemons."

GAYLOR: "Well, what's your side of the story? What happened?"

DEFENDANT: *"I don't know if I should without an attorney.* (Laughter.) It ain't going to do me no . . . . (Laughter.)" (Italics added.)

ALLEN: "Well, we need to know. Let's put it this way, Kurt. He just advised you of your rights. And you said, that yeah, you wanted to talk to us. There's no problem. If at any time that you do not want to talk with us, you can stop at any particular time. If there's any time that we ask you a question that you don't want to answer, you can stop at any time."

DEFENDANT: *"Okay, that one.* (Laughter.)" (Italics added.)

ALLEN: "Well, what I'm saying is that we just want to make sure you understand all those things."

DEFENDANT: "Okay, I appreciate it."

ALLEN: "And the other thing that Chuck said was we have uh pretty much understand what the story is and we like to going to give you your opportunity."

DEFENDANT: "You're one up on me."

ALLEN: "To understand your side of the story. How's that?"

DEFENDANT: "I don't know what stories you've been told, and how accurate they are."

ALLEN: "Would it help you if we told you what, uh . . ."

DEFENDANT: "What information you got? That would be a blast."

■ Defendant here contends: (1) the italicized language from his conversation with Detectives Allen and Gaylor shows that he asserted his rights to counsel and to remain silent; (2) the confession and its context showed that defendant was under the influence of methamphetamine and lacked capacity to waive his rights; and (3) his waiver of his rights was the result of impermissible "softening-up" tactics by the detectives.

### 2. *Assertions of the right to counsel and to remain silent*

Defendant recognizes that under *Davis v. United States* (1994) 512 U.S. 452, 456, 459 [114 S.Ct. 2350, 2353-2354, 2355, 129 L.Ed.2d 362] and *People v. Crittenden* (1994) 9 Cal.4th 83, 130-131 [36 Cal.Rptr.2d 474, 885 P.2d 887], a request for counsel must be unequivocal. He acknowledges that defendant's first statement—"I don't know if I should without a lawyer"—is at best an equivocal request for representation. He argues, however, that his statement—"Okay, that one"—made in response to Detective Allen's comment, makes the request for counsel unequivocal and constitutes an unequivocal assertion of the right to silence.

We disagree. Defendant's statement, "Okay, *that one*" implies a refusal to answer a particular question, perhaps Detective Gaylor's question asking defendant: "[W]hat's your side of the story? What happened?" Defendant did not assert a right to refuse to answer any questions, ask that the questioning come to a halt, or request counsel. Instead, he was showing that he knew he could refuse to answer any or all questions and would exercise this right on a question-by-question basis. From time to time in the interrogation he did refuse to answer specific questions. But the words defendant used, and his subsequent conduct, do not show that he wanted to stop the interrogation and bar all further questions.

The case is analogous to *People v. Silva* (1988) 45 Cal.3d 604 [247 Cal.Rptr. 573, 754 P.2d 1070]. There, the defendant waived *Miranda* rights

and answered several questions, then refused to answer a question that might place him at the site where the murder victim was kidnapped. The interrogation continued, with the defendant answering some questions and not others. We concluded that the defendant's constitutional rights were not violated, because "[a] defendant may indicate an unwillingness to discuss certain subjects without manifesting a desire to terminate 'an interrogation already in progress.' " (45 Cal.3d at pp. 629-630.) The same is true here.

### 3. *Capacity to waive Miranda rights*

■ Describing himself as a habitual user of methamphetamine, defendant argues that his responses during the interrogation suggest he was under the influence of that substance. Defendant, however, specifically denied being under the influence of alcohol or narcotics at the time of the interview. Contrary to counsel's suggestion, we cannot determine from defendant's conversational pattern in a written transcript whether he was under the influence of methamphetamine, and if so, to such an extent that he was not competent to waive his rights. Moreover, defendant's failure to raise this issue in the trial court bars him from asserting it on appeal. (See *People v. Kipp* (2001) 26 Cal.4th 1100, 1130 [113 Cal.Rptr.2d 27, 33 P.3d 450]; *People v. Ray* (1996) 13 Cal.4th 313, 339 [52 Cal.Rptr.2d 296, 914 P.2d 846].)

### 4. *Police "softening-up" of defendant*

■ Before advising defendant of his constitutional rights, Detective Gaylor commented that there were two sides to every story. According to defendant, that comment was designed to soften him up and induce a confession. In support, he cites this passage from *People v. Honeycutt* (1977) 20 Cal.3d 150, 160-161 [141 Cal.Rptr. 698, 570 P.2d 1050]: "It must be remembered that the purpose of *Miranda* is to preclude police interrogation unless and until a suspect has voluntarily waived his rights or has his attorney present. When the waiver results from a clever softening-up of a defendant through . . . ingratiating conversation, the subsequent decision to waive without a *Miranda* warning must be deemed to be involuntary for the same reason that an incriminating statement made under police interrogation without a *Miranda* warning is deemed to be involuntary." The Attorney General in reply correctly observed that the facts here are not at all like *Honeycutt*, which, as described in *People v. Kelly*, involved "an unrecorded 30-minute, pre-*Miranda* conversation, discussing mutual acquaintances, past events and finally the victim." (*People v. Kelly* (1990) 51 Cal.3d 931, 954 [275 Cal.Rptr. 160, 800 P.2d 516].)

In the trial court, defendant unsuccessfully argued that his confession was inadmissible because he did not waive his *Miranda* rights to counsel and to

remain silent. The issue he now raises is different—he claims that even if he did waive his *Miranda* rights, that waiver was involuntary. ■ The determination whether a waiver is voluntary is one entrusted to the trial judge, based on the totality of the facts and circumstances, including the background, experience and conduct of the accused. (See *People v. Kelly, supra,* 51 Cal.3d at p. 950.)

■ Because defendant failed to raise the voluntariness issue at trial, he cannot raise it now. (*People v. Ray, supra,* 13 Cal.4th at p. 339.) Defendant contends here that the issue is preserved for appeal by his trial court objection to the admissibility of the confession on the ground that he did not waive his *Miranda* rights. Because such an objection does not ordinarily lead to the presentation of evidence of defendant's background, experience, and conduct—evidence essential to determining whether a waiver was voluntary—we reject that contention.

### B. *Defendant's Guilty Plea*

#### 1. *Background*

On October 4, 1988, the prosecution filed a two-count complaint against defendant, alleging one count of robbery and one count of murder, without specifying the degree of the murder or adding special circumstance allegations. Defendant pleaded not guilty. At the bail review hearing on October 19, the prosecution persuaded the court to deny bail on the ground that special circumstance charges might be added to the complaint, a decision the prosecution said it would make after the preliminary hearing.

At the start of the preliminary hearing on December 6, 1988, defense counsel said his client would plead guilty to murder, and offered a fully executed change of plea form to the court. The prosecutor asked the court not to accept the plea, stating that the prosecution would amend the complaint to add special circumstance allegations. After a recess, the prosecution offered an amended complaint. The magistrate then rejected the guilty plea and allowed the filing of the amended complaint.

Defendant contends: (1) the magistrate erred in refusing to accept his guilty plea before the filing of an amended complaint charging special circumstances; and (2) the filing of the amended complaint was a vindictive act, to penalize him for attempting to exercise his statutory right to plead guilty to the face of the complaint, and should have been rejected by the magistrate.

#### 2. *The magistrate's rejection of defendant's guilty plea*

■ Defendant argues that he had an absolute right to plead guilty to the murder charge in the complaint. He relies on section 859a and the cases

interpreting that statute. Section 859a, subdivision (a), provides in pertinent part: "While the charge remains pending before the magistrate and when defendant's counsel is present, the defendant may plead guilty to the offense charged, or, with the consent of the magistrate and the district attorney or other counsel for the people, . . . plead guilty or nolo contendere to any other offense the commission of which is necessarily included in that with which he is charged . . . ."

Defendant sought to plead guilty to the charge of murder, not to any lesser included offense, so the consent of the magistrate and the district attorney was not required.[4] A defendant charged in more than one count has the right under section 859a to plead to an individual count. (See *People v. Reza* (1984) 152 Cal.App.3d 647, 653-654 [199 Cal.Rptr. 664].)

█ The Attorney General points out that section 1009, after providing that a prosecutor may amend a complaint without leave of court before a defendant enters a plea, states that after a defendant has pleaded or demurred to the charges "[t]he court in which an action is pending may order or permit an amendment of an indictment, accusation or information, or the filing of an amended complaint, for any defect or insufficiency, at any stage of the proceedings . . . ." Certain amendments are prohibited—those which change the offenses charged, or alter an information to add charges not supported by the evidence at the preliminary hearing. (*Ibid.*) But the statute does not prohibit the prosecution from amending a complaint, indictment, or information after a defendant offers to plead guilty.

Another statute, section 969.5, specifically authorizes amendment of a complaint after a plea of guilty to charge prior felony convictions. In *People v. Superior Court (Alvarado)* (1989) 207 Cal.App.3d 464 [255 Cal.Rptr. 46], the Court of Appeal held that a trial court had abused its discretion by refusing to allow an amendment after a guilty plea adding a prior felony conviction that made the defendant ineligible for probation. Rejecting the defendant's contention that section 969.5 was inconsistent with section 1009, the Court of Appeal said that section 969.5 was simply an example of the general rule that with leave of court charges could be amended after a guilty plea. (*Alvarado,* at p. 476.) We conclude that the magistrate here had discretion to permit the prosecution to amend the complaint against defendant.

---

[4]The magistrate erroneously reasoned that because the plea did not specify the degree of the murder, it was a plea to second degree murder, and that under section 859a, a plea to a lesser included offense required the consent of the prosecution. A defendant, however, may plead guilty to murder without specifying the degree (*People v. Atchley* (1955) 132 Cal.App.2d 444, 446 [282 P.2d 160]), leaving it to the court to decide the degree of the crime. (§ 1192.)

■ The question remains whether the magistrate abused his discretion in granting the prosecutor leave to amend after defendant stated his desire to plead guilty to murder. On this subject, both parties call our attention to *Cronk v. Municipal Court* (1982) 138 Cal.App.3d 351 [188 Cal.Rptr. 28]. In that case a murder defendant, scheduled to enter a plea on July 24, 1981, made an ex parte motion to advance that date to July 21. On July 21, he appeared and offered to plead guilty. The prosecutor objected, asserting that he intended to add special circumstance charges but had not yet prepared an amended complaint. The Court of Appeal in *Cronk* rejected the defendant's contention that the magistrate erred in rejecting the plea. ■ It stated that " '[i]f the defense, without notice to the other side, accelerated a hearing date so as to cut off a legitimate right to amend [citation], the magistrate has the inherent power to restore that right to the prosecution by refusing to accept the plea . . . .' " (*Id.* at p. 354.)

■ Defendant here points out that he did not manipulate the court's calendar, but offered his plea on the date scheduled. Defendant, however, knew of the prosecution's express intention to decide whether to charge special circumstances after the preliminary hearing, yet defendant gave no advance notice of his intent to enter a guilty plea before the preliminary hearing. Under these circumstances, the magistrate was within his discretion in refusing to accept the plea and allowing the prosecution to amend the complaint.

Because we conclude that defendant was not deprived of any right under state law, we necessarily reject his contention that the magistrate's order deprived defendant of a state-created due process right protected under the Fourteenth Amendment to the federal Constitution.

### 3. *Allegedly vindictive prosecution*

After the prosecution amended the complaint to charge special circumstances, defendant moved to strike the special circumstances. He contended that the amendment was a vindictive response to his attempt to exercise his right to plead guilty. The trial court held an evidentiary hearing and denied the motion.

There is no doubt that the timing of the amendment was occasioned by the defendant's attempt to plead guilty to the charge of murder. But there is nothing in the record to show the amendment was a vindictive response. The prosecution had already made clear, before defendant's plea, that it was considering special circumstance allegations. There is nothing suspicious in its failure to file them with the initial charges. " ' "[A] prosecutor should

remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution. An initial decision should not freeze future conduct [because] the initial charges filed by a prosecutor may not reflect the extent to which an individual is legitimately subject to prosecution." ' " (*People v. Edwards* (1991) 54 Cal.3d 787, 828 [1 Cal.Rptr.2d 696, 819 P.2d 436], quoting *In re Bower* (1985) 38 Cal.3d 865, 874 [215 Cal.Rptr. 267, 700 P.2d 1269].)

Here, defendant was not yet in jeopardy. The United States Supreme Court has refused to apply a presumption of vindictiveness in a pretrial setting. (*United States v. Goodwin* (1982) 457 U.S. 368, 384 [102 S.Ct. 2485, 2494, 73 L.Ed.2d 74].) In *Edwards* we noted that the attachment of jeopardy was an "important factor" in determining vindictiveness (*People v. Edwards, supra,* 54 Cal.3d at p. 828), and although *Edwards* did not absolutely prohibit a court from presuming vindictiveness in a pretrial setting, neither *Edwards* nor any other California case has done so. (See *People v. Bracey* (1994) 21 Cal.App.4th 1532, 1544 [26 Cal.Rptr.2d 730], and cases there cited.) The circumstances here do not present a "reasonable likelihood of vindictiveness" (*In re Bower, supra,* 38 Cal.3d 865, 877) that would shift the burden of proof to the prosecution to show that the amendment "was justified by some objective change in circumstances or in the state of the evidence." (*Id.* at p. 879.)

Because vindictiveness is not presumed, the defense must present evidence showing that the " 'prosecutor's charging decision was motivated by a desire to punish [the defendant] for doing something the law plainly allows him to do.' " (*People v. Bracey, supra,* 21 Cal.App.4th at p. 1549, quoting *United States v. Goodwin, supra,* 457 U.S. at p. 384 [102 S.Ct. at p. 2494].) Defendant here failed to present such evidence.

C. *Sufficiency of the Evidence of Special Circumstances*

1. *Standard of review*

■ In reviewing the sufficiency of evidence on appeal, the court must review the "entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence which is reasonable, credible, and of solid value—that would support a rational trier of fact in finding the [defendant guilty] beyond a reasonable doubt." (*People v. Lewis* (2001) 25 Cal.4th 610, 642 [106 Cal.Rptr.2d 629, 22 P.3d 392]; see *People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) This standard also applies to a finding of special circumstances. (*People v. Mayfield* (1997) 14 Cal.4th 668, 790-791 [60 Cal.Rptr.2d 1, 928 P.2d 485].)

## 2. *The special circumstance of lying in wait*

■ The jury found that defendant "intentionally killed the victim while lying in wait." (§ 190.2, former subd. (a)(15), added by Prop. 7, § 6, as approved by voters, Gen. Elec. (Nov. 7, 1978).) The voters passed an initiative measure that subsequently amended subdivision (a)(15) by changing "*while*" lying in wait to "*by means of*" lying in wait. (Stats. 1998, ch. 629, enacted as Prop. 18, approved by voters, Prim. Elec. (Mar. 7, 2000) eff. Mar. 8, 2000.) This special circumstance requires proof of "an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage." (*People v. Morales* (1989) 48 Cal.3d 527, 557 [257 Cal.Rptr. 64, 770 P.2d 244]; see *People v. Sims* (1993) 5 Cal.4th 405, 432 [20 Cal.Rptr.2d 537, 853 P.2d 992].) ■ Here, defendant and Popik waited outside JoAnn Clemons's apartment for two to three hours, concealed from view by bushes that separated their hiding place from the building's parking lot. They were waiting for two reasons. One was to delay their entry until JoAnn's apartment lights went out, when she would presumably be asleep. As defendant explained in his confession, "[w]e wanted her asleep" because then the killing would be a "little less noisy." The other reason for waiting was that Paulk had not yet arrived in the getaway car. When defendant and Popik saw the apartment lights go out, they continued to wait for Paulk. After Paulk arrived a half-hour to an hour later, defendant and Popik set out for JoAnn's apartment. Waiting and watching until a victim falls asleep before attacking is a typical scenario of a murder by means of lying in wait. (See *People v. Hardy* (1992) 2 Cal.4th 86, 163-164 [5 Cal.Rptr.2d 796, 825 P.2d 781]; *People v. Ruiz* (1988) 44 Cal.3d 589, 615 [244 Cal.Rptr. 200, 749 P.2d 854]; *People v. McDermand* (1984) 162 Cal.App.3d 770, 784 [211 Cal.Rptr. 773].)

Defendant distinguishes the cited cases by noting that they concern lying in wait as proof of first degree murder, not as proof of a special circumstance. According to defendant, the special circumstance of lying in wait has an immediacy requirement. (See *Houston v. Roe* (9th Cir. 1999) 177 F.3d 901, 907; *Domino v. Superior Court* (1982) 129 Cal.App.3d 1000, 1011 [181 Cal.Rptr. 486].) That requirement is set out in CALJIC No. 8.81.15, which was given to the jury in this case: "For a killing to be perpetrated while lying in wait, both the concealment and watchful waiting as well as the killing must occur in the same time period, or in an uninterrupted attack commencing no later than the moment concealment ends. If there is a clear interruption separating the period of lying in wait from the period during which the killing takes place, so that there is neither an immediate killing nor a

continuous flow of uninterrupted lethal events, the special circumstance is not proved."[5] Defendant maintains that the facts here show a "cognizable interruption" (*People v. Morales, supra,* 48 Cal.3d at p. 558) between the period of concealment and watchful waiting and the killing.

If the only interruption was the time required for defendant and Popik to emerge from their hiding place, cross the apartment building's parking lot, and enter the victim's apartment, that interruption would not preclude application of the special circumstance of lying in wait. The victim's death would have followed in a continuous flow from the concealment and watchful waiting. The special circumstance of lying in wait does not require that the defendant strike his blow from the place of concealment. (*People v. Hardy, supra,* 2 Cal.4th 86, 164.)

That defendant and Popik waited a half-hour or more after the victim's apartment lights went out, until Paulk arrived in the getaway car, does not preclude the special circumstance of lying in wait. "As long as the murder is immediately preceded by lying in wait, the defendant need not strike at the first available opportunity, but may wait to maximize his position of advantage before taking the victim by surprise." (*People v. Ceja* (1993) 4 Cal.4th 1134, 1145 [17 Cal.Rptr.2d 375, 847 P.2d 55].) Whether defendant waited the half-hour or more to make sure JoAnn was asleep, as the Attorney General contends, or to make sure his escape car was available, as defendant said in his confession, is immaterial, since the victim was killed in an uninterrupted flow of events from the time defendant and Popik emerged from their hiding place.

### 3. *Burglary and robbery special circumstances*

Before the murder occurred, defendant told four people (Mark Herbert, Joseph Paulk, Kimberly Pratt, and Velinda Davis) that he was going to "tax" someone in Escondido. He told Pratt he was going to get jewelry from an old lady, and that Pratt should meet him in a bar at closing time if she wanted a good deal. He offered Herbert $5,000 to participate, and promised Popik his choice of items from the Clemons's apartment.

The murder scene showed signs of a robbery—furs were spread on the couch, and a purse was found with its contents dumped out. When Popik was arrested, he had a Walkman radio and three sets of earrings from the

[5]The instruction is based on *People v. Morales, supra,* 48 Cal.3d at pages 554-559. After section 190.2, subdivision (a)(15) was amended, the Committee on Standard Jury Instructions replaced CALJIC No. 8.81.15 with a new instruction. The Use Note to the new instruction states that CALJIC No. 8.81.15 should still be used for murders that occurred before March 7, 2000.

apartment. Defendant in his confession said that he took nothing from the apartment. He later remarked to Kimberly Buckhalter that he had furs and jewelry she might want. There is, however, no evidence that anything was missing from the apartment other than the items found with Popik.

The evidence of burglary and robbery is uncontested. Defendant recruited Popik by promising him that he could have his choice of property from JoAnn's apartment. Defendant opened the apartment door for Popik, and the two together subdued and killed JoAnn. Popik was later arrested with property taken from JoAnn. On these facts, it is clear that Popik is guilty of burglary and robbery, and that defendant was his accomplice.

The prosecution, however, did not try the case on a theory that defendant was an accomplice to Popik's burglary and robbery. Neither does the Attorney General defend the verdict on such a theory here. Instead, he maintains that the defendant entered the apartment and killed JoAnn with the intention of stealing her property, but was interrupted when the police arrived and escaped without taking anything. (See *People v. Zapien* (1993) 4 Cal.4th 929, 984 [17 Cal.Rptr.2d 122, 846 P.2d 704], upholding a special circumstance finding based on robbery although the defendant fled without taking any property.)

Defendant said his reason for killing JoAnn was to protect Christina, his girlfriend, from abuse by her mother, JoAnn. The Attorney General agrees that this was one reason, but argues that defendant had a separate, independent felonious purpose—to steal her property. Such a concurrent intent will support the felony-murder special circumstance. (*People v. Zapien, supra,* 4 Cal.4th at p. 984; *People v. Bonin* (1989) 47 Cal.3d 808, 850-851 [254 Cal.Rptr. 298, 765 P.2d 460]; *People v. Murtishaw* (1981) 29 Cal.3d 733, 752, fn. 13 [175 Cal.Rptr. 738, 631 P.2d 446].) Defendant here responds that even if he planned a robbery, the robbery was merely incidental to the murder. (See *People v. Green* (1980) 27 Cal.3d 1, 60-61 [164 Cal.Rptr. 1, 609 P.2d 468] [robbery to conceal identity of murder victim and thus facilitate killer's escape]; *People v. Thompson* (1980) 27 Cal.3d 303, 323-325 [165 Cal.Rptr. 289, 611 P.2d 883] [threat of robbery to conceal that a defendant's goal was murder—after the killing the defendant left without taking the property the victim had given him].) He claims that he had no motive to steal from JoAnn other than to reward his accomplices, because once he had killed JoAnn, Christina, his girlfriend, would inherit JoAnn's property and could simply enter the apartment and take whatever she wanted.

The question whether the burglary and robbery in this case were "merely incidental" to the murder was submitted to the jury under proper instructions, so the issue is simply whether substantial evidence supports the jury's

verdict. We conclude that it does. Defendant is in effect arguing that we should believe his confession, in which he said his only motive was to protect Christina, and should disregard as boasting the comments he made before and after the murder. Defense witnesses described defendant as given to boasting to protect his image, but the jury could conclude otherwise and could infer from the evidence that defendant had an independent, if secondary, purpose of taking property from JoAnn.

### 4. *Murder for financial gain*

 Substantial evidence supports the special circumstance finding of murder for financial gain. (§ 190.2, subd. (a)(1).) Before JoAnn's murder, Velinda Davis heard defendant tell Christina, "Now we can knock off the old lady." Christina replied "And then we can get the money." Defendant told codefendant Popik that JoAnn had insurance coverage of $100,000, and that the money would help Christina and him to get a new start, and would provide Christina with money "to do good." After the murder Christina told the police that defendant said he thought her mother had insurance. After his confession to the police, when Detective Gaylor asked defendant if the life insurance policy was a secondary benefit of killing JoAnn, defendant agreed. Defendant said Christina had told him about JoAnn's insurance policy, and that she was interested in going to a mechanics school in Phoenix and needed $9,000.

A killing for the purpose of obtaining life insurance benefits, as contrasted with a killing during a burglary or robbery, falls squarely within the scope of the financial gain special circumstance. To avoid any overlap with burglary or robbery special circumstances, we have construed the financial gain special circumstance to apply "only when the victim's death is the consideration for, or an essential prerequisite to, the financial gain sought by the defendant." (*People v. Bigelow* (1984) 37 Cal.3d 731, 751 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th 723].) Obtaining life insurance benefits falls within this description, because the death of the insured is an essential prerequisite for the financial gain. (See *People v. Hardy, supra,* 2 Cal.4th 86; *Lewis v. Witik* (C.D.Cal. 1996) 927 F.Supp. 1288.)

Defendant argues that his primary purpose in killing JoAnn was to protect Christina from abuse by JoAnn, but the financial gain special circumstance applies even if the gain is only a secondary purpose. (*People v. Noguera* (1992) 4 Cal.4th 599, 635 [15 Cal.Rptr.2d 400, 842 P.2d 1160].) Neither does it matter that no financial gain was realized because the insurer refused to pay the benefits to Christina, the beneficiary of JoAnn's life insurance policy, because Christina was involved in JoAnn's murder. (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1025 [254 Cal.Rptr. 586, 766 P.2d 1].) Finally,

it does not matter that Christina, not defendant, would be the direct recipient of the financial gain. Although some cases in which the defendant was the direct recipient have used language that spoke of the special circumstance as applying when the defendant expected to obtain financial gain (e.g., *People v. Howard* (1988) 44 Cal.3d 375, 409 [243 Cal.Rptr. 842, 749 P.2d 279]) the statute is not so limited, but speaks of intentional murder "carried out for financial gain." (§ 190.2, subd. (a)(1).) There is no reason why it should not apply to an intentional murder carried out for the financial gain of a third person.

### D. *Issues Relating to Defendant's Representation*

The trial court initially appointed James Burns and Charles Duff to represent defendant. On July 31, 1989, the court replaced Duff, the second counsel, with Mark Chambers. On August 21, 1989, the court granted defendant's *Marsden* motion (*People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]) and removed lead counsel James Burns. Two days later, at the hearing to appoint counsel, Chambers said he and defendant had interviewed several attorneys and wanted a one-week continuance so the attorneys could apply to the court for appointment. The court refused the continuance and also refused to delay matters for 15 minutes so one of the attorneys interviewed, Mr. Mueller, could appear. Instead, the court appointed Richard Grossberg as lead attorney. Chambers continued to serve as second counsel. The judge explained that he would not appoint Chambers as lead counsel because of Chambers's lack of experience and the fact that he was rated by the San Diego Public Defender's Office as a Class III Attorney; the office requires a Class VI rating to act as lead attorney in a capital case.

On December 7, 1989, defendant moved to have Grossberg removed from the case, asserting that Grossberg was not putting in the time needed to prepare the defense. The motion was denied. On January 18, 1990, Grossberg moved to be relieved as counsel. This motion was also denied.

Grossberg renewed his motion to be relieved on February 5, 1990. On the same day defendant moved to represent himself. After a hearing, the trial court again refused to relieve Grossberg.

The court then turned to defendant's motion to represent himself. Finding that defendant was competent and lucid and had made a knowing waiver of the right to counsel, the court granted the motion. It appointed Chambers and Grossberg as advisory counsel.

On February 13, defendant asked for a 60-day continuance to prepare for trial. He explained that because he was considered suicidal, he had been

placed in a cell that did not give him access to telephones or legal documents. The court granted the motion and ordered that defendant be housed in the downtown San Diego jail where he would have better access to legal materials.

On March 9, defendant, through advisory attorney Chambers, asked for an additional six-month continuance of trial. The motion was based on problems with the lack of preparation and investigation by his former attorneys. The court denied the motion and the case went to trial on April 23, 1990.

Although defendant represented himself, with Grossberg and Chambers as his advisory counsel, at trial Chambers, who initially had been second counsel, took on the role of lead counsel. Grossberg did not participate and defendant's participation was minimal. Whenever the judge asked defendant if he intended to participate, he replied that Chambers was his attorney and would represent him. Chambers conducted the voir dire, examined witnesses, and presented all arguments, both at the guilt phase and at the penalty phase.

### 1. *Defendant's request for a continuance to find an attorney*

After granting defendant's motion to remove Burns as defendant's lead counsel, the trial court announced its intention to appoint Richard Grossberg. The judge described Grossberg as "having a long legacy of having handled homicide matters," and being an "amiable individual" who could probably get along with defendant. Mark Chambers, the second counsel, explained that he and defendant had interviewed several attorneys. He asked for a 15-minute delay so that one of those attorneys, Mr. Mueller, could arrive, but the judge replied, "[I]f Mr. Mueller was present, I would have to tell him, weighing the two, I would appoint Mr. Grossberg anyway. Mr. Grossberg has far more experience." The court said that another attorney suggested by Chambers, Mr. Mills, was well qualified but was not present and had not indicated a willingness to take the assignment.

At the hearing defendant did not object to Grossberg's appointment other than to note he was not among the attorneys defendant and Chambers had interviewed. Now defendant claims that Grossberg was not qualified because he had tried only one capital case, and that trial had occurred before the United States Supreme Court decided *Furman v. Georgia* (1972) 408 U.S. 238 [92 S.Ct. 2726, 33 L.Ed.2d 346]. But Grossberg's qualifications would depend on his experience in trying criminal cases, not just his experience in capital cases, and an attorney with a long legacy of handling homicide cases may be qualified to take on a capital case. Grossberg was one of three San

Diego County attorneys classified by the public defender as Class VI—qualified to handle a capital case.

The trial court gave defendant the opportunity to express his views on who should be appointed. (See *People v. Chavez* (1989) 26 Cal.3d 334, 346-347 [161 Cal.Rptr. 762, 605 P.2d 401].) Chambers mentioned the names of some attorneys, but offered no reason why they would be a better choice than Grossberg. Under these circumstances, having found a competent attorney who was willing to serve as lead counsel, the trial court had no obligation to continue the proceedings to consider other possible appointees.

### 2. *Defendant's motion to remove Grossberg*

Defendant first sought to remove lead counsel Grossberg on December 1, 1989. On December 7, he moved to recuse the trial judge because he had appointed Grossberg, and advanced several objections to Grossberg's performance. Some of defendant's objections were quite general: that Grossberg had failed to follow through on many defense options, and that he was unwilling to fight for defendant's basic rights. Defendant's only specific complaint was that Grossberg had interviewed him in a jail interview room that was reputed to be illegally monitored. Defendant said his relationship with Grossberg had deteriorated to the point that defendant had ordered Grossberg not to contact him or anyone else concerning the case.

The trial court concluded that defendant had failed to show that he was not receiving adequate assistance from counsel, and that the difficulties encountered by defense counsel were caused by defendant's unwillingness to cooperate.

On January 18, 1990, Grossberg moved to be relieved as counsel. He said he could not properly prepare for trial because his relationship with defendant had completely broken down and defendant refused to speak with him. Grossberg also said he had a conflict with second counsel Chambers. Defendant and Chambers wanted the robbery charges against defendant tried first, which Grossberg opposed. There were other disagreements about strategy and investigation. The judge denied the motions for recusal and for removal of Grossberg.

A further hearing on February 5, 1990, showed continuing conflict between Grossberg, Chambers, and defendant. The court refused to remove Grossberg, but suggested the possibility that Chambers take over as lead counsel. Defendant, however, said he would prefer to represent himself.

 A trial court must grant a motion to replace counsel "if the record clearly shows that the . . . appointed attorney is not providing adequate

representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citations]." (*People v. Crandell* (1988) 46 Cal.3d 833, 854 [251 Cal.Rptr. 227, 760 P.2d 423].) Nothing in the record here shows that Grossberg was incompetent or would not provide adequate representation if he received defendant's cooperation. But it is clear that he and defendant were in a conflict that could imperil Grossberg's ability to provide effective representation. One consequence of the conflict is that defendant refused to review his confession with Grossberg, depriving Grossberg of the opportunity to determine whether any part of it was untrue.

But that does not demonstrate an "irreconcilable conflict" that would require the trial court to replace appointed counsel. Defendant cannot simply refuse to cooperate with his appointed attorney and thereby compel the court to remove that attorney. " '[I]f a defendant's claimed lack of trust in, or inability to get along with, an appointed attorney were sufficient to compel appointment of substitute counsel, defendants effectively would have a veto power over any appointment and by a process of elimination could obtain appointment of their preferred attorneys, which is certainly not the law.' " (*People v. Berryman* (1993) 6 Cal.4th 1048, 1070 [25 Cal.Rptr.2d 867, 864 P.2d 40], quoting *People v. Crandell, supra,* 46 Cal.3d at p. 860.)

Here the record suggests that defendant would not cooperate with any attorney not "pre-cleared" by him and second counsel Mark Chambers. Defendant complained that Grossberg was not doing enough to prepare for trial, yet Grossberg at defendant's request worked diligently to improve defendant's conditions of confinement, attended the trial of codefendant Popik, and interviewed witnesses. Defendant objected that defense investigator Thomas, of whom he disapproved, called a witness and scared the witness, but defendant did not set out what Thomas said to the witness. The nature of defendant's complaints suggests that defendant's principal objection to Grossberg was that Grossberg was managing the defense as a lead attorney should do, rather than deferring to defendant's opinions. Under these circumstances, the trial court could reasonably conclude that the conflict between lead counsel and defendant was not irreconcilable, but that defendant was rejecting reconciliation and refusing to cooperate, with the goal of removing Grossberg and replacing him with Chambers.

### 3. *Defendant's request to represent himself*

 Defendant contends that the trial court erred in granting his request to represent himself. (See *Faretta v. California* (1975) 422 U.S. 806 [95 S.Ct. 2525, 45 L.Ed.2d 562].) Defendant does not claim that he was incompetent to represent himself, or that the judge failed to advise him properly on

the dangers and consequences of that action. He contends, instead, that his request to represent himself was not unequivocal, because he made it clear that he only wanted to represent himself if the court refused to remove Grossberg as his attorney. He points out that the court is not required to grant an equivocal request for self-representation. (*People v. Hines* (1997) 15 Cal.4th 997, 1028 [64 Cal.Rptr.2d 594, 938 P.2d 388].)

Defendant confuses an "equivocal" request with a "conditional" request. There is nothing equivocal in a request that counsel be removed and, if not removed, that the defendant wants to represent himself. Once the court has decided not to remove counsel, the defendant has the choice of going ahead with existing counsel or representing himself. There is nothing improper in putting the defendant to this choice, so long as the court did not err in refusing to remove counsel. (*People v. Smith* (1985) 38 Cal.3d 945, 957 [216 Cal.Rptr. 98, 702 P.2d 180]; see *People v. Crandell, supra,* 46 Cal.2d 833, 860-861 [*Faretta* motion voluntary, although made in response to trial court's ruling denying defendant's motion to remove counsel].) If, under these circumstances, the defendant elects to represent himself, he need not show that he would make the same decision if offered other counsel.

Moreover, even if an initial request for self-representation is equivocal, the trial court is not required to deny it without further inquiry. Here the trial court discussed the perils of self-representation with defendant, and in that discussion defendant made it unequivocally clear that he wanted to represent himself.

 4. *Defendant's request for an additional six-month continuance of trial*

 One week after the trial court had granted his motion to represent himself, defendant asked for a 60-day continuance to prepare for trial. The court granted the request and set the trial for April 23, 1990. On March 9, however, defendant asked for an additional six-month continuance. Defendant complained that he had not been put in a "pro. per. cell" with access to law books and writing implements until February 23; that his former investigator, Thomas, had done little work; and that he did not receive necessary funding until March 13, 1990. The prosecutor pointed out that Attorney Chambers and the new defense investigator, Atwell, had been working on the case for months. Funding of $54,081.25 had been approved on February 7. The court noted that defendant would have the benefit of pretrial motions prepared by Grossberg. It noted also that defendant had been placed in the "pro. per. cell" 60 days before trial, and that he would probably have at least 90 days before opening statements at the trial. (The actual time before opening statements was 105 days.) The court then denied the request.

"The granting or denial of a motion for continuance rests within the sound discretion of the trial court." (*People v. Mickey* (1991) 54 Cal.3d 612, 660 [286 Cal.Rptr. 801, 818 P.2d 84].) Here considerable work had been done to prepare for trial at the time of defendant's motion, and although much remained to be done, defendant had 60 days remaining in which to prepare. He had funding, an active investigator, and advisory counsel who was familiar with the case. The trial court's ruling was not an abuse of discretion.

### 5. *Alleged ineffective assistance of advisory counsel*

Before looking to the specific instances of ineffective assistance claimed by defendant, we address the Attorney General's preemptive contention that there is no right to advisory counsel (*People v. Clark* (1992) 3 Cal.4th 41, 111 [10 Cal.Rptr.2d 554, 833 P.2d 561]; *People v. Bloom* (1989) 48 Cal.3d 1194, 1218 [259 Cal.Rptr. 669, 774 P.2d 698]; see *McKaskle v. Wiggins* (1984) 465 U.S. 168, 183 [104 S.Ct. 944, 953-954, 79 L.Ed.2d 122]), and therefore defendant cannot complain if advisory counsel's performance falls below professional standards. Respondent cites three federal cases that have rejected a contention of ineffective assistance of standby counsel, the federal equivalent of advisory counsel: *U.S. v. Schmidt* (2d Cir. 1997) 105 F.3d 82, 90; *U.S. v. Cochrane* (9th Cir. 1993) 985 F.2d 1027, 1029; and *U.S. v. Windsor* (7th Cir. 1992) 981 F.2d 943, 946-947. Each of these decisions, however, left open the possibility that on different facts the federal court might allow a pro se defendant to challenge the performance of standby counsel.

California decisions, however, provide a narrow and limited range within which a defendant can raise the issue of ineffectiveness of advisory counsel. In *People v. Hamilton* (1989) 48 Cal.3d 1142, at footnote 14 on pages 1164-1165 [259 Cal.Rptr. 701, 774 P.2d 730], we said that "[o]n posttrial review, . . . a self-represented defendant may only raise those narrow claims of 'ineffective assistance' which arise directly from *assisting counsel's* breach of the *limited* authority and responsibilities counsel has assumed." In *People v. Bloom, supra,* 48 Cal.3d at pages 1226-1227, we explained that: "To prevail on a claim that counsel acting in an advisory or other limited capacity has rendered ineffective assistance, a self-represented defendant must show that counsel failed to perform competently *within the limited scope of the duties assigned to or assumed by counsel* [citations] and that a more favorable verdict was reasonably probable in the absence of counsel's failings [citations]. A self-represented defendant may not claim ineffective assistance on account of counsel's omission to perform an act within the scope of duties the defendant voluntarily undertook to perform

personally at trial." Our recent decision in *People v. Lawley* (2002) 27 Cal.4th 102, 145 [115 Cal.Rptr.2d 614, 38 P.3d 461] confirmed that when advisory counsel is appointed "the defendant is entitled to expect professionally competent assistance within the narrow scope of advisory counsel's proper role." We find no reason to reconsider that analysis.

 The record here, however, is insufficient to establish ineffective assistance of advisory counsel. We have repeatedly emphasized that a claim of ineffective assistance is more appropriately decided in a habeas corpus proceeding. (*People v. Mendozo Tello* (1997) 15 Cal.4th 264, 266-267 [62 Cal.Rptr.2d 437, 933 P.2d 1134]; *People v. Wilson* (1992) 3 Cal.4th 926, 936 [13 Cal.Rptr.2d 259, 838 P.2d 1212]; *People v. Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) The defendant must show that counsel's action or inaction was not a reasonable tactical choice, and in most cases " ' "the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged . . . ." ' " (*People v. Mendozo Tello, supra,* at p. 266; *People v. Wilson, supra,* at p. 936; *People v. Pope, supra,* at p. 426.) Moreover, when, as here, a defendant has chosen self-representation, the defendant has the power to make the tactical decisions. Thus when a defendant raises an issue of effective assistance of advisory counsel, defendant must also show that counsel's challenged action or inaction was not the result of the defendant's own decision, with advisory counsel merely carrying out defendant's directions. Finally, in ruling on the merits of a claim of ineffective assistance of counsel, the appellate court may need to assess the cumulative effect of several claimed deficiencies, which is difficult if discussion is fragmented between the appeal and the habeas corpus petition.[6]

 Defendant argues that his advisory counsel was incompetent on five grounds:

(1) Chambers did not request a jury instruction on unreasonable self-defense.

(2) Chambers's cross-examination of Mark Herbert and Velinda Davis elicited negative testimony that defendant had sold methamphetamine to Herbert and that Davis did not believe that defendant's girlfriend, Christina, had so much influence over defendant that he would kill for her.

---

[6]Defendant acknowledges that his claims pertaining to ineffective assistance of advisory counsel would be better presented in a petition for habeas corpus, but he fears that to do so will run the risk of waiver as to any claims that might be presentable on appeal. (See *In re Dixon* (1953) 41 Cal.2d 756, 759 [264 P.2d 513].) After defendant's brief was filed, however, we said in *In re Robbins* (1998) 18 Cal.4th 770 [77 Cal.Rptr.2d 153, 959 P.2d 311], that this court will not apply the procedural bar of *Dixon* to claims of ineffective assistance of counsel. (*Robbins, supra,* at p. 814, fn. 34.)

(3) Chambers failed to object to instances of prosecutorial misconduct. Defendant points in particular to the prosecutor's cross-examination of Christina about the incident where she and defendant had been arrested for illegal possession of knives, and evidence that defendant had beaten Christina and once had left her bound for several hours. Some of the evidence about defendant's beating Christina was ultimately excluded by the trial court on its own motion, and the jury was directed to disregard it.

(4) Chambers's cross-examination of witnesses, and his closing argument, fell below professional standards. Defendant objects in particular to Chambers's concession in closing argument that defendant was guilty of first degree murder, even though Chambers went on to argue against special circumstance findings.

(5) Counsel failed to object on the right grounds when, after a prosecution witness, criminologist William Chisum, testified that he did not know how many knives were used in the murder, the prosecutor asked him if he had talked to defendant about where the knives might be. Chambers did object to the question as argumentative, and the objection was sustained. Defendant's claim on appeal is that Chambers should also have objected that the question sought an unconstitutional comment on defendant's decision not to testify, a form of objection that might preserve a federal constitutional issue that could be raised in a federal habeas corpus proceeding.

The appellate record does not disclose advisory counsel Chambers's reasons for any of these alleged derelictions, nor whether he was acting under defendant's direction. The latter point is particularly relevant to Chambers's concession in closing argument of defendant's guilt of first degree murder, because in a discussion outside the jury's presence defendant had personally told the trial court he admitted guilt of first degree murder and asked the court to limit the trial to the issue of special circumstances. Because the record on appeal does not show Chambers's reasons for any of the challenged actions, nor whether he was acting under defendant's direction, we conclude that all the competency of counsel issues should be raised by petition for habeas corpus, instead of on appeal.

E. *Prosecutorial Misconduct at the Guilt Phase*

Defendant accuses the prosecutor of misconduct when he asked criminologist William Chisum: "And you haven't had a chance to talk to Mr. Michaels about where any of those knives [the knives used in the murder] might be, have you?" Chisum answered: "No, sir, I have not talked to Mr. Michaels." The trial court sustained defendant's objection and admonished the jury not to consider the question and answer.

It is doubtful whether the prosecutor's question could be construed as a comment on defendant's failure to testify; it appears to be a comment only on the scope of Chisum's investigation. It was, however, argumentative and defendant successfully objected on that ground. We perceive no reason why the trial court's action in sustaining the objection and admonishing the jury would be insufficient to cure any harm.

Defendant also complains of the prosecutor's questions to prosecution witnesses Rodney Hatch and Leon Madrid that elicited replies that defendant showed no remorse after the murder. Defendant's contention that remorse or the absence of remorse is inadmissible at the guilt phase overstates the law. Absence of remorse is irrelevant to prove that a defendant committed a homicide, but it may be relevant, because it sheds light on the defendant's mental state, in determining the degree of the homicide or the existence of special circumstances. (See *People v. Mayfield* (1993) 5 Cal.4th 142, 178-179 [19 Cal.Rptr.2d 836, 852 P.2d 331].)

Defendant made damaging admissions to both Hatch and Madrid. He claimed those statements were not true, but constituted boasting designed to enhance defendant's image as a powerful and dangerous person. Defendant's demeanor when he made those statements would help the jury determine whether they constituted truthful admissions or mere braggadocio. That the questions elicited replies that defendant did not appear remorseful does not make them improper.

Defendant complains that the prosecutor asked four witnesses—Mark Hebert, Velinda Davis, Kimberly Buckhalter, and Dennis Lucas—if they had ever previously seen defendant wearing a suit. Defendant only objected once, on the third such occasion, and that objection was sustained. His failure to object bars him from claiming prosecutorial misconduct on the other three occasions. (*People v. Lewis, supra,* 25 Cal.4th 610, 670-671.)

Defendant also complains of the prosecutor's questions about defendant's violence toward Christina, but he failed to object at trial. The trial court, however, excluded the evidence on its own motion and admonished the jury to disregard it. We conclude both that the defendant did not preserve the issue for appeal, and that defendant has shown no prejudice.

F. *Jury Instructions*

1. *Failure to instruct sua sponte on the doctrine of unreasonable defense of others*

Defendant contends the court should have instructed on its own motion that if he killed JoAnn in the actual but unreasonable belief that the

killing was necessary to protect Christina from JoAnn's physical and sexual abuse, then he would only be guilty of voluntary manslaughter. Defendant relies by analogy on the established doctrine of unreasonable or imperfect self-defense.

"Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually*, but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter." *(In re Christian S.* (1994) 7 Cal.4th 768, 771 [30 Cal.Rptr.2d 33, 872 P.2d 574].) As we explained in *People v. Barton* (1995) 12 Cal.4th 186, 200-201 [47 Cal.Rptr.2d 569, 906 P.2d 531], imperfect self-defense is not an affirmative defense, but a description of one type of voluntary manslaughter. Thus the trial court must instruct on this doctrine, whether or not instructions are requested by counsel, whenever there is evidence substantial enough to merit consideration by the jury that under this doctrine the defendant is guilty of voluntary manslaughter. *(Id.* at pp. 194, 201.) If it were a true affirmative defense, however, an instruction would be required only if it appears that the defendant was relying on the defense, or that there was substantial evidence supportive of the defense, and the defense was not inconsistent with the defendant's theory of the case. *(Id.* at p. 195; see *People v. Sedeno* (1974) 10 Cal.3d 703, 716 [112 Cal.Rptr. 1, 518 P.2d 913].)

The doctrine of unreasonable or imperfect defense of others, in contrast to the doctrine of unreasonable or imperfect self-defense, is not well established in California law. It has been recognized in only one decision, *People v. Uriarte* (1990) 223 Cal.App.3d 192, 198 [272 Cal.Rptr. 693], and there the court found the doctrine inapplicable because Uriarte did not present evidence that he believed (reasonably or unreasonably) that the asserted danger to his wife was imminent or that shooting the victims was necessary to rescue her. *Uriarte* was decided two months after this case was tried. Thus at the time of the trial here, there was no California authority recognizing a doctrine of imperfect defense of others.

Because defendant did not submit an instruction on unreasonable defense of others, he can only argue here that the trial court should have given such an instruction on its own motion. The trial court, however, has no duty to so instruct on doctrines of law that have not been established by authority.

*People v. Flannel* (1979) 25 Cal.3d 668, 680-681 [160 Cal.Rptr. 84, 603 P.2d 1] explained: "[E]ven in the absence of a request, a trial court must instruct on the general principles of law governing the case, i.e., those

principles relevant to the issues raised by the evidence, but need not instruct on specific points developed at trial. 'The most rational interpretation of the phrase "general principles of law governing the case" would seem to be as those principles of law *commonly* or closely and openly connected with the facts of the case before the court.' [Citations.] [¶] . . . Given the unique nature of [the] rule [urged by the defendant], obfuscated by infrequent reference and inadequate elucidation, we conclude that heretofore it could not be so considered." (Fn. omitted.)

■■■ *Flannel* held that a trial court was not required to instruct on imperfect self-defense until that defense was recognized by California decisions. (*People v. Flannel, supra,* 25 Cal.3d at pp. 680-683.) Applying the same analysis, courts have refused to require a trial court to instruct on its own motion that an unreasonable belief one is acting under duress is a partial defense to robbery (*People v. Bacigalupo* (1991) 1 Cal.4th 103, 125-126 [2 Cal.Rptr.2d 335, 820 P.2d 559] (*Bacigalupo I*)); that imperfect self-defense is a defense to the crime of torture (*People v. Vital* (1996) 45 Cal.App.4th 441, 446 [52 Cal.Rptr.2d 676]); or that imperfect self-defense is a defense to the crime of mayhem (*People v. Sekona* (1994) 27 Cal.App.4th 443, 451 [32 Cal.Rptr.2d 606]).

This reasoning governs here. At the time of defendant's trial, the concept of imperfect defense of others was not a commonly known and established defense. We acknowledge that this concept follows logically from the interplay between statutory and decisional law. Section 197 provides that "[h]omicide is . . . justifiable when committed by any person . . . [¶] . . . [w]hen resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person." Innovative counsel could view that statute in light of *Flannel's* analysis of imperfect self-defense (see *People v. Flannel, supra,* 25 Cal.3d at pp. 674-680), and propose an instruction on imperfect defense of others. But the trial court here was not required to so instruct on its own motion, because the doctrine of imperfect or unreasonable self-defense was not a well-established legal doctrine under California law.

It is also doubtful whether defendant was entitled to an instruction on imperfect defense of others, or whether the failure to give such an instruction could be found prejudicial. Defendant's problem is that both self-defense and defense of others requires a fear of *imminent* harm (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082 [56 Cal.Rptr.2d 142, 921 P.2d 1]), so presumably imperfect self-defense or imperfect defense of others would require an unreasonable belief that harm was imminent. But when defendant committed the homicide, Christina was at Broad Horizons, a youth detention facility,

and murder victim JoAnn was asleep in her apartment. The record does not indicate when Christina would next be released to visit JoAnn, but even if it was the next day it is doubtful that the facts would show that defendant believed, reasonably or unreasonably, that any threatened danger to Christina was "imminent."

### 2. Jury instruction on the defense of necessity

The trial court instructed the jury: "It is not a defense under the law of necessity that the homicide was committed to prevent the victim from committing future wrongdoing against the defendant or another." The court erred in giving this instruction. No defense of necessity was presented, and no evidence was presented to support such a defense. The prosecutor offered the instruction out of concern that the jurors would on their own come up with such a defense and apply it in this case. But the jury was correctly instructed on the law of homicide and the defenses, and those instructions plainly excluded any defense of necessity. Instructions should not be unnecessarily complicated by telling the jury that a defense unclaimed by the defendant and excluded by the other instructions is inapplicable.

The trial court's error in instructing on the defense of necessity was harmless, however, because defendant did not assert this defense. Defendant here argues that the instruction precluded the jury from considering evidence of the murder victim's abuse of her daughter Christina, defendant's girl-friend. The instruction, however, was limited to the defense of necessity, a defense that could, if present, lead to complete exoneration. It did not prevent the jury from considering the evidence of abuse in connection with defendant's argument that he killed in the heat of passion, or that he did not act with the motivation required for some of the special circumstances—the main focus of the guilt trial—or as mitigating evidence in the penalty phase.

### G. Videotape Evidence

The prosecution offered into evidence several still photographs of the victim's body and a police videotape made shortly after the murder. The first segment of the videotape showed the areas around the victim's apartment, including defendant's escape route. Defendant here does not object to that segment. The second segment showed the victim's nude body lying between the bed and the wall. Defendant complains that this segment contained repeated close-up shots of the victim's pubic area, falsely implying that she had been sexually assaulted. (At the time the videotape was made, the police thought the victim had been sexually assaulted.) The video's third segment was taken at the coroner's office. After showing the

body being lifted to an examining table and the coroner opening the victim's eyes, the video segment focused on the fatal throat wound and then the bagging of the victim's hands and feet. Defendant argues that all this was especially gruesome and unnecessary.

At trial, the defense moved to exclude the photographs and the videotape. The judge noted that bagging the hands and feet was relevant because the prosecutor introduced evidence of one of defendant's hairs that was found in the victim's hands. The judge later found that the segment showing the victim's body at the crime scene was relevant to the special circumstance of lying in wait, apparently because it showed her nude in her bedroom, implying that the assailants waited until she was in bed or asleep before attacking. The judge mentioned that he had presided over the trial of codefendant Popik, and the jurors there did not seem shocked by the videotape. The judge also noted that the jurors in this case had been questioned extensively in voir dire about their ability to deal with graphic photographs. He concluded that the photographs and videotape would not have a prejudicial effect that outweighed their probative value.

Defendant questions whether voir dire can ever prepare a jury adequately for gruesome photographs and videotapes. He adds that everything shown by the videotape was also proven by less shocking evidence. ▇▇ Although photographic evidence is often cumulative of testimonial evidence, that fact does not require its exclusion, "[b]ecause the photographic evidence could assist the jury in understanding and evaluating the testimony." (*People v. Price* (1991) 1 Cal.4th 324, 441 [3 Cal.Rptr.2d 106, 821 P.2d 610].) It is, however, a factor the trial court may consider in exercising its discretion under Evidence Code section 352. (*People v. Marsh* (1985) 175 Cal.App.3d 987, 998 [221 Cal.Rptr. 311].)

In ruling on the admissibility of photographs and videotapes under Evidence Code section 352, "the court enjoys broad discretion in deciding whether prejudice substantially outweighs probative value." (*People v. Memro* (1995) 11 Cal.4th 786, 866 [47 Cal.Rptr.2d 219, 905 P.2d 1305].) ▇▇ The trial judge here was conscious of that discretion, and of the danger that gruesome evidence could prejudice the jury, and ruled carefully in admitting the evidence. The photographs, and most of the videotape, were unquestionably probative. Defendant suggests that the tapes could have been edited to eliminate sexual suggestiveness and to avoid showing the victim's body being lifted to the coroner's table. But whether or not such editing would have been desirable, we cannot find an abuse of discretion in the trial judge's conclusion that the tape as a whole was more probative than prejudicial.

## IV. PENALTY PHASE ISSUES

### A. *Admission of Aggravating Evidence*

#### 1. *Evidence of defendant's claim to be a contract killer*

 . Most of defendant's taped confession was admitted at the guilt phase, but the court excluded that portion in which defendant claimed that he was a contract killer and had committed 10 to 15 contract killings. The prosecution asked to play the entire recording at the penalty trial. Over defense objection, the judge granted this request.

Before the tape was played to the jury, the judge gave a limiting instruction: Defendant's statements as to possible other homicides were being "offered on the issue of his mental state and motive on the nature and circumstances of the present offense, and not for the truth of whether there were other homicides." The jury was not to consider such evidence "for any purpose except the limited purpose for which it is admitted."

The prosecutor did not argue that defendant had committed other homicides. Instead, he argued that the confession showed one of defendant's motives in killing JoAnn was to enhance his reputation as a ruthless and dangerous person: "[Defendant] needs to have it on the streets that he was a killer. And that's one of the reasons why he cut JoAnn Clemons's throat. So he could feel good about himself, so he could scare people. . . . So [defendant] sat on a lady's chest and cut her throat so he could pump up his reputation."

Defendant contends that this court's decision in *People v. Phillips* (1985) 41 Cal.3d 29 [222 Cal.Rptr. 127, 711 P.2d 423], compels the conclusion that defendant's statements about his commission of contract killings were not admissible. In *Phillips*, the prosecution presented evidence of four instances in which Phillips had discussed committing other crimes. The evidence was offered under factor (b) of section 190.3, which permits the penalty jury to consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." We examined the evidence of each of the four incidents and concluded that one showed solicitation of murder in violation of section 653f. (*Phillips,* at pp. 75-77.) The evidence of the other three instances, however, failed to show the commission of a crime. (*Id.* at pp. 73-75.) They were therefore inadmissible under factor (b), and the trial court's error in admitting that evidence, in connection with other errors, led to a reversal of the penalty judgment in *Phillips*.

We agree with the Attorney General that *Phillips* is distinguishable. The evidence there was offered as proof of a criminal act involving force or violence under factor (b) of section 190.3, without any limiting instruction. The prosecution had argued that Phillips was planning or at least proposing to commit the murders he discussed, and that the evidence showed Phillips's casual attitude toward killing and his readiness to commit murder. (*People v. Phillips, supra,* 41 Cal.3d at p. 83.) The evidence in the case before us was offered under section 190.3, factor (a), as part of the circumstances of the charged murder, not under factor (b). The trial court here told the jury it could not consider defendant's confession as proof that he had committed other homicides. The prosecution did not claim defendant had committed any contract killings or planned to do so. The evidence was admitted solely to show defendant's attitude and motive in connection with the charged murder and, so limited, was properly admitted.

Defendant also objects to the admission of a paper that said "hit list," followed by a list of names, that he was carrying when he was arrested. Murder victim JoAnn Clemons's name was not on the list.

Possession of the list was not a crime, and there was no evidence defendant actually intended to kill anyone on the list, so it was not admissible under section 190.3, factor (b). The trial court, however, admitted the list under section 190.3, factor (a) as an "overall background piece of information," which would help the jury evaluate the nature and circumstances of the murder.

The prosecution does not claim defendant had the list when he killed JoAnn Clemons. Its theory is that the list, like defendant's confession to being a professional hit man and enforcer, shows defendant's motive to establish a reputation as a contract killer. It was admissible for that purpose.

Defendant argues, however, that both the list and the statement in his confession that he was a contract killer should have been excluded as more prejudicial than probative under Evidence Code section 352, which authorizes a trial court in its discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." In reply, the Attorney General argues that section 352 is inapplicable to penalty phase evidence offered under Penal Code section 190.3, factor (a). In *People v. Box* (2000) 23 Cal.4th 1153 [99 Cal.Rptr.2d 69, 5 P.3d 130], however, we concluded that the trial court retains a limited discretion to exclude unduly inflammatory evidence. "[T]he trial court," we said, "lacks

discretion to exclude *all* factor (a) evidence on the ground that it is inflammatory or lacking in probative value." (*Id.* at pp. 1200-1201.) It retains, however, "its traditional discretion to exclude 'particular items of evidence' by which the prosecution seeks to demonstrate either the circumstances of the crime (factor (a)), or violent criminal activity (factor (b)), in a 'manner' that is misleading, cumulative, or unduly inflammatory." (*Id.* at p. 1201.)

The trial court here did not abuse its discretion in admitting the challenged evidence. The prejudicial effect of the evidence was that it might lead the jury to believe that defendant had committed other murders or planned to do so. But in view of the prosecutor's avoidance of any such claim, the absence of any evidence to support it, and the trial court's limiting instruction, it is far more likely that the jurors would recognize the defendant's actions as mere braggadocio. Thus the trial court could reasonably conclude that, as long as it gave limiting instructions, the probative value of the evidence at issue would outweigh its prejudicial effect.

### 2. *Evidence of defendant's possession of weapons*

Factor (b) of section 190.3 permits the introduction of evidence of "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." The prosecution presented evidence that on November 27, 1987, defendant was arrested in Texas for possession of a double-edged dagger with a seven-inch blade and a butcher knife with an eight-inch blade, both of which were illegal under Texas law. On January 23, 1988, he was arrested in California for illegal possession of knives. Finally on August 31, 1988, the day after defendant's robbery of Fuller at Camp Pendleton, defendant was found in a parking lot with a concealed handgun in the glove box. None of these events involved the actual or attempted use of force, or an express threat to use force. The issue here is whether the evidence is admissible as proof of an implied threat.

In a series of cases beginning with *People v. Harris* (1981) 28 Cal.3d 935, 962-963 [171 Cal.Rptr. 679, 623 P.2d 240], and continuing through *People v. Ramirez* (1990) 50 Cal.3d 1158, 1186 [270 Cal.Rptr. 286, 791 P.2d 965], *People v. Tuilaepa* (1992) 4 Cal.4th 569, 589 [15 Cal.Rptr.2d 382, 842 P.2d 1142], and *People v. Williams* (1997) 16 Cal.4th 153, 238 [66 Cal.Rptr.2d 123, 940 P.2d 710], we have held that the possession of a weapon in a custodial setting—where possession of any weapon is illegal—"involve[s] an implied threat of violence even when there is no evidence defendant used or displayed it in a provocative or threatening manner." (*People v. Tuilaepa, supra,* 4 Cal.4th at p. 589; *People v. Jackson* (1996) 13 Cal.4th 1164, 1260 [56 Cal.Rptr.2d 49, 920 P.2d 1254] (conc. opn. of Baxter, J.).)

Three cases discuss implied threats under section 190.3, factor (b) in a noncustodial setting. In *People v. Belmontes* (1988) 45 Cal.3d 744 [248 Cal.Rptr. 126, 755 P.2d 310], the prosecution presented evidence that the defendant had slapped his side indicating that "he had a handgun in his waistband, while stating that he had 'all the protection he needed.' " (*Id.* at p. 809.) We held that it was error to admit this evidence: "Although such [conduct] is arguably an 'express or implied threat to use force or violence' (§ 190.3), it was not directed at a particular victim or victims, and did not amount to criminal conduct in violation of a penal statute." (*Ibid.*) Defendant here relies on *Belmontes* to support his contention that the challenged evidence was improperly admitted, but *Belmontes* turned on the fact that the conduct there was not criminal. By contrast, here in each instance defendant's possession was illegal. His possession of knives in Texas was illegal, both because the blades exceeded five inches and because the dagger was double-edged. His possession of knives and a firearm in California were concealed, making the possession illegal under California law. (§ 12020, subd. (a).)

Two other cases have found an implied threat in a noncustodial context. In *People v. Clair* (1992) 2 Cal.4th 629, 676 [7 Cal.Rptr.2d 564, 828 P.2d 705], the defendant carried a knife while committing a burglary, but did not use it. The court held that his action was "an implied threat to use the knife against anyone who might interfere." (*Id.* at p. 677.) In *People v. Garceau* (1993) 6 Cal.4th 140 [24 Cal.Rptr.2d 664, 862 P.2d 664], a search of the residence of the defendant, an ex-felon, turned up a machine gun, a silencer, and concealable handguns. The defendant's possession of these firearms was illegal. We held that the evidence was properly admitted. (*Id.* at pp. 203-204.)

Defendant's possession similarly shows an implied intention to put the weapons to unlawful use. On two occasions the weapons defendant possessed were knives with seven to eight inch blades; in *People v. Ramirez, supra,* 50 Cal.3d at pages 1186-1187, we said that "such an implement is a 'classic instrument[] of violence' [citation] that is 'normally used only for criminal purposes.' " Indeed JoAnn Clemons was killed with a similar knife. The concealed firearm found on defendant was the same gun he had used to rob Chad Fuller the previous day.

We conclude that the criminal character of defendant's possession of knives and firearms, and the evidence of defendant's use of those or similar weapons to commit crimes, are sufficient to permit a jury to view his possession as an implied threat of violence. Defendant, of course, was free to and did present evidence to the jury to show that his possession was for the purpose of self-protection, or the protection of someone else, not for criminal violence. (*People v. Ramirez, supra,* 50 Cal.3d at p. 1187.)

### 3. *Defendant's pending armed robbery charge*

Defendant argues that the armed robbery charge pending against him at the time of the murder trial, stemming from the August 30, 1988, robbery of Chad Fuller could not be admitted under factor (c) of section 190.3, because that factor is limited to convictions entered before the date of the murder. Defendant is correct as to factor (c). (*People v. Balderas* (1985) 41 Cal.3d 144, 203 [222 Cal.Rptr. 184, 711 P.2d 480].) The evidence was admissible, however, under factor (b) of section 190.3 as proof of a criminal act involving force or violence. (See *People v. Caro* (1988) 46 Cal.3d 1035, 1055-1057 [251 Cal.Rptr. 757, 761 P.2d 680].)

### 4. *The Popik note*

At the penalty phase the prosecution offered as rebuttal evidence a note defendant had given to his attorney during the preliminary hearing. (At the time of the preliminary hearing the case against defendant had not been severed from that against Popik and Paulk.) The note read in part: "Neither of [Popik's] co-defendants are willing to restrain themselves from doing Popik bodily harm if forced to be locked up to him or sit next to him. Popik will be hurt if something can't be worked out."

When the prosecutor initially offered the note, the trial court ruled that it was not admissible under section 190.3, factor (a) or (b). After defendant had presented evidence from his minister, his stepfather, and a psychiatrist that he was not a violent person, the prosecutor again offered the evidence as rebuttal. The trial court admitted it because rebuttal evidence does not have to pertain to a specific aggravating factor. (*In re Ross* (1995) 10 Cal.4th 184, 206-207 [40 Cal.Rptr.2d 544, 892 P.2d 1287].)

Defendant argues that introduction of the note violated the attorney-client privilege. The note was unquestionably a communication from the client to the attorney, and thus falls within the broad privilege established by Evidence Code section 954. The Attorney General relies on the exception to that privilege "if the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit a crime or a fraud." (Evid. Code, § 956.) This exception is inapplicable here. Defendant did not seek advisory counsel's services to commit a crime; he was asking counsel's help to avoid the commission of a crime.

We discussed the application of the attorney-client privilege to threats of future criminal conduct in *People v. Clark* (1990) 50 Cal.3d 583 [268 Cal.Rptr. 399, 789 P.2d 127]. There, the trial court admitted evidence that

defendant, when examined by a defense psychiatrist, threatened to kill the victim's brother. (Although the statement was made to a psychiatrist, the attorney-client privilege applied because the psychiatrist had been appointed to assist defense counsel.) (*Id.* at pp. 618-619, fn. 28.) We held that the admission of this evidence violated the attorney-client privilege, although it was not prejudicial. (*Id.* at p. 623.) *Clark* observed that "[n]o express exception to the attorney-client privilege exists for threats of future criminal conduct" (*id.* at p. 621), and that "[t]he comments of the California Law Revision Commission accompanying these sections suggest that no exception was intended to apply to a statement of intent to commit a crime alone." (*Ibid.*)

Recognizing that existing law might require an attorney to conceal knowledge that the attorney's client was planning to commit a serious crime, the 1993 Legislature enacted section Evidence Code 956.5, which provides that there is no attorney-client privilege "if the lawyer reasonably believes that disclosure of any confidential communication . . . is necessary to prevent the client from committing a criminal act that the lawyer believes is likely to result in death or substantial bodily harm." If this statute had been in effect at the time of defendant's trial, the Popik note would have been admissible. Defendant, however, was tried in 1990, three years before Evidence Code section 956.5 took effect. Thus, the trial court erred in ruling that the attorney-client privilege did not protect defendant from the introduction of the Popik note.

The trial court's error was harmless. Although the Popik note shows that defendant was aware of his own violent impulses, it was in fact a successful appeal to defendant's attorney to take action to avert the violence. The jury might even have viewed it as favorable to defendant. It is not reasonably possible that its admission made the difference between a verdict of death and one of life imprisonment without possibility of parole. (See *People v. Jackson, supra,* 13 Cal.4th at p. 1232; *People v. Brown* (1988) 46 Cal.3d 432, 446-449 [250 Cal.Rptr. 604, 758 P.2d 1135].)

B. *Jury Instructions*

■ Defendant asked the court to instruct the jury that, under section 190.3, factor (k), they could consider: whether defendant was "emotionally impacted" by his sister's sexual abuse by his father, the rape of his mother, and the rape of his sister; whether defendant was "motivationally impacted" by JoAnn's sexual and physical abuse of Christina; and whether defendant was impaired as a result of his overall psychological condition. Except for the last matter, the trial court rejected the proffered items as argumentative, but instructed the jury on defendant's overall psychological condition.

That ruling was correct. The rejected portion of the proposed instruction assumed facts that were not necessarily true—e.g., that defendant's mother and sister were raped—and constituted claims properly presented in argument, not instructions. *People v. Earp* (1999) 20 Cal.4th 826, 886 [85 Cal.Rptr.2d 857, 978 P.2d 15], upheld a trial court's refusal to give a similar instruction, noting that because such an instruction " 'invite[s] the jury to draw inferences favorable to one of the parties from specified items of evidence,' it is considered 'argumentative' and therefore should not be given."

Defendant next complains that the trial court gave an instruction, requested by the prosecution, that evidence had been introduced of seven prior criminal acts that might have involved force or violence, or the threat of force of violence. The court explained to the jury that an act violating multiple statutes constituted a single aggravating act, and that the jury could not consider such an act unless it was convinced that the act was proven beyond a reasonable doubt. The court then explained the elements of each of the crimes involved. Defendant asserts that by giving these instructions, while rejecting most of the defendant's proposed instructions, the court created a prejudicial imbalance in the jury's consideration of aggravating and mitigating factors.

The prosecutor's proposed instructions related to evidence under factor (b) of section 190.3. Although other aggravating or mitigating factors do not carry a burden of proof, under factor (b) a juror may not consider evidence of the defendant's prior conduct unless convinced beyond a reasonable doubt that the conduct occurred and constituted a crime. (*People v. Robertson* (1982) 33 Cal.3d 21, 53-56 [188 Cal.Rptr. 77, 655 P.2d 279]; *People v. Bittaker* (1989) 48 Cal.3d 1046, 1103 [259 Cal.Rptr. 630, 774 P.2d 659].) That determination may require the juror to know the elements of the relevant crimes, so in *People v. Davenport* (1985) 41 Cal.3d 247, 281-282 [221 Cal.Rptr. 794, 710 P.2d 861], we held that a trial court may instruct on the elements of those crimes when either the prosecution or the defense requests such an instruction, or when the court itself determines that the instruction is vital to a proper consideration of the evidence. The trial court's instruction here was proper under *Davenport*. Unlike the defense instruction the court rejected, the court's factor (b) instructions did not merely highlight evidence, but explained legal principles essential to the juror's evaluation of that evidence.

C. *Alleged Ineffective Assistance of Counsel at the Penalty Phase*

Defendant argues that advisory counsel Chambers failed to object prosecutorial misconduct during closing argument at the penalty phase. He points to two instances:

1. In response to defendant's evidence that he had joined a church during his stay in Texas, the prosecutor observed in argument that defendant's tackle box had a drawing of a pentagram and the number 666, which "I think we call devil worship, and three sixes is a sign of the beast, and that is Mr. Michaels; he is a beast."

2. The prosecutor argued that Joseph Paulk, whom defendant recruited as the getaway driver, was "another victim" of defendant's because Paulk "will be serving a life sentence for this murder." The prosecutor's statement that Paulk would serve a life sentence was premature. At the time of penalty phase arguments in the case here, Paulk was still awaiting trial and had not been sentenced.

The record before us does not disclose Attorney Chambers's reasons for not objecting to these statements. Accordingly, as we explained earlier, the claim that counsel was constitutionally incompetent in failing to object cannot be raised on appeal, but only by petition for habeas corpus. (See *ante,* at p. 526.)

### D. *Prosecutorial Misconduct at the Penalty Phase*

The defense did object to one penalty phase argument by the prosecutor. The prosecutor asked the jurors to: "Just think of all the generations of prisoners that will go through the prison system and be exposed to [the] extreme danger that is Kurt Michaels. Just think of all the prison guards who will be lucky enough to meet Kurt Michaels." The trial court overruled the objection but told the prosecutor to move on to a new subject.

Defendant contends that because future dangerousness is not a listed aggravating factor, the prosecutor can argue that point only to rebut defense argument or evidence. We disagree. This court has "repeatedly declined to find error or misconduct where argument concerning a defendant's future dangerousness in custody is based on evidence of his past violent crimes admitted under one of the specific aggravating categories of section 190.3." (*People v. Ray* (1996) 13 Cal.4th 313, 353 [52 Cal.Rptr.2d 296, 914 P.2d 846].) Likewise, in *People v. Champion* (1995) 9 Cal.4th 879, 940 [39 Cal.Rptr.2d 547, 891 P.2d 93], a case in which the defendant introduced no penalty phase evidence, we said: "Although we have held that at the penalty phase of a capital case the prosecutor may not introduce expert testimony forecasting that, if sentenced to life without the possibility of parole, a defendant will commit violent acts in prison (*People v. Murtishaw* (1981) 29 Cal.3d 733, 779 [175 Cal.Rptr. 738, 631 P.2d 446]), we have never held that in closing argument a prosecutor may not comment on the possibility that if

the defendant is not executed he or she will remain a danger to others. Rather, we have concluded that the prosecutor may make such comments when they are supported by the evidence."

## V. CONSTITUTIONAL CHALLENGES TO THE CALIFORNIA DEATH PENALTY LAW

Defendant asserts that California's death penalty law suffers from a number of constitutional defects. We have in past decisions rejected each of these contentions.

He first argues that section 190.3 does not sufficiently narrow the class of murderers eligible for the death penalty. (See *Zant v. Stephens* (1983) 462 U.S. 862, 887-888 [103 S.Ct. 2733, 2748-2749, 77 L.Ed.2d 235]; *People v. Bacigalupo* (1993) 6 Cal.4th 457, 462-463 [24 Cal.Rptr.2d 808, 862 P.2d 808].) As in *People v. Wader* (1993) 5 Cal.4th 610, 669 [20 Cal.Rptr.2d 788, 854 P.2d 80], "defendant has not demonstrated on this record, or through sources of which we might take judicial notice, that his claims are empirically accurate, or that, if they were correct, this would require the invalidation of the death penalty law." Section 190.2, which sets out the special circumstances, on its face provides some criteria that may narrow the class of death-eligible persons. Contrary to defendant's contention, we cannot simply deduce from the language and structure of section 190.2 and the cases interpreting that section that this narrowing is constitutionally inadequate.

The absence of a burden of proof, except for proof of prior criminal acts under section 190.3, factor (b), does not render the California law unconstitutional. (*People v. Samayoa* (1997) 15 Cal.4th 795, 852-853 [64 Cal.Rptr.2d 400, 938 P.2d 2] [no burden to prove death is the appropriate penalty]; *People v. Rodriguez* (1986) 42 Cal.3d 730, 777-778 [230 Cal.Rptr. 667, 726 P.2d 113] [no burden of proof for aggravating factors]; *People v. Alcala* (1992) 4 Cal.4th 742, 802 [15 Cal.Rptr.2d 432, 842 P.2d 1192] [no requirement that aggravating factors been proven beyond a reasonable doubt].) No written findings are required. (*People v. Davenport* (1995) 11 Cal.4th 1171, 1232 [47 Cal.Rptr.2d 800, 906 P.2d 1068].)

Neither the federal Constitution nor state law requires intercase proportionality review. (*Pulley v. Harris* (1984) 465 U.S. 37 [104 S.Ct. 871, 79 L.Ed.2d 29]; *Bacigalupo I, supra,* 1 Cal.4th at p. 151.) Defendant here does *not* contend on appeal that the death penalty is disproportionate to his individual culpability. (See *Bacigalupo I, supra,* at p. 152.)

We have held that the California law is not unconstitutional because it allows the introduction, as an aggravating consideration, of unadjudicated

criminal acts (*People v. Robertson* (1989) 48 Cal.3d 18, 42 [255 Cal.Rptr. 631, 767 P.2d 1109]) and does not require that the jury agree unanimously on whether the defendant committed those crimes (*People v. Alcala* (1992) 4 Cal.4th 742, 809 [15 Cal.Rptr.2d 432, 842 P.2d 1192]). We have rejected contentions that factors (d) and (g) of section 190.3 are unconstitutionally vague, because factor (d) refers to "extreme" mental or emotional distur-bance and factor (g) to "extreme" duress. (*People v. Holt* (1997) 15 Cal.4th 619, 698-699 [63 Cal.Rptr.2d 782, 937 P.2d 213] [factor (d)]; *People v. Visciotti* (1992) 2 Cal.4th 1, 75 [5 Cal.Rptr.2d 495, 825 P.2d 388] [factor (g)].) Finally, we do not require a trial court to instruct the jury as to the meaning of "mitigation." (*People v. Hawkins* (1995) 10 Cal.4th 920, 965 [42 Cal.Rptr.2d 636, 897 P.2d 574].)

## DISPOSITION

The judgment is affirmed.

George, C. J., Baxter, J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied September 18, 2002. George C. J., and Baxter, J., did not participate therein.