Filed 6/25/13  P. v. Marquez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>VICTOR ALEXANDER MARQUEZ,<br><br>    Defendant and Appellant. | F063837<br><br>(Super. Ct. No. VCF222534)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Gerald F. Sevier, Judge.

Jerome P. Wallingford, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Charles A. French and Tia M. Coronado, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## SEE CONCURRING OPINION

A jury convicted Victor Alexander Marquez of the stabbing murder of Maria Juarez (Pen. Code, § 187, subd. (a)) and found true the special circumstance that the murder was committed during the commission of a robbery (*id.,* § 190.2, subd. (a)(17)(A)). The trial court sentenced Marquez to a term of life without the possibility of parole. He was 17 at the time of the crime. There is no doubt Marquez committed the murder. He confessed to the crime, his DNA was found at the scene as the result of a wound he suffered during the murder, and Juarez's and Marquez's DNA was found on the murder weapon that was hidden in his bedroom.

Marquez argues the trial court erred when it refused to suppress his confession and the incriminating evidence found when police officers searched his residence pursuant to a probation search condition. He also claims the trial court erred when it denied his numerous motions for the appointment of new counsel pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*). We disagree and affirm the conviction.

Marquez also contends the sentence of life without the possibility of parole constitutes cruel and unusual punishment, in violation of the Eighth Amendment to the United States Constitution. While this case was pending, the United States Supreme Court issued its decision in *Miller v. Alabama* (2012) 567 U.S. ___ [132 S.Ct. 2455] (*Miller*), which held that a sentencing scheme that mandates a sentence of life without the possibility of parole for a juvenile offender for a homicide offense constitutes cruel and unusual punishment.

California's sentencing scheme does not suffer from this deficit because the trial court had the discretion to sentence Marquez to a term of 25 years to life but chose not to exercise that discretion. *Miller,* however, strongly implies that only in unusual circumstances will a sentence of life without the possibility of parole for a juvenile convicted of a homicide offense comply with the Eighth Amendment. *Miller* also provides relevant criteria for the sentencing court to consider when considering a life sentence. Since the trial court did not have *Miller* to guide its sentencing decision, it did

2.

not consider all of the factors the Supreme Court considers relevant to the Eighth Amendment analysis. To ensure Marquez's sentence does not violate the Eighth Amendment, we will reverse the judgment and remand for resentencing to permit the trial court to consider the effect of *Miller* on its sentencing decision.[1]

## FACTUAL AND PROCEDURAL SUMMARY

The information charged Marquez with one count of murder and alleged the special circumstance that the murder was committed during the course of a robbery. In addition, the information alleged that Marquez used a deadly and dangerous weapon within the meaning of Penal Code section 12022, subdivision (b)(1).

At approximately 6:33 a.m., Visalia Police Officer William Brokhoff was dispatched to an alley where he discovered the dead body of a Hispanic female, later identified as Ms. Juarez, lying in a pool of blood. In addition to the pool of blood near the victim, numerous blood drops were located on the ground leading away from the victim's body, and a bloody palm print and blood spatter were found on a wall.

Nineteen slash and/or stab wounds were found on the victim's body. Three of the wounds in the upper chest/neck area were deep enough to puncture the left carotid artery, the right carotid artery, and the right subclavian artery. The combination of these three wounds caused massive bleeding and the victim's death.

Investigating officers obtained information that led them to Marquez, primarily Marquez's proximity to the crime scene and visible injuries to his hand that could have been consistent with knife wounds. Blood-stained clothing was found in Marquez's bedroom, and a folding knife wrapped in a T-shirt was located under the mattress. Based on information obtained from Marquez, three items of blood-stained clothing (two

---

[1]This issue is pending before the California Supreme Court in *People v. Gutierrez* (2012) 209 Cal.App4th 646, review granted Jan. 3, 2013, S206365, and *People v. Moffett* (2012) 209 Cal.App.4th 1465, review granted Jan. 3, 2013, S206771.

shirts and a pair of shorts) were found in the dumpster of an apartment complex northeast of the crime scene.

Marquez consented to an interview with the investigating officers. While he initially denied any involvement in the murder, he eventually confessed to stabbing Ms. Juarez while attempting to rob her.

DNA evidence indicated that Marquez could not be eliminated as the source of blood in the blood drops leaving the crime scene. Population data suggested that Marquez was the donor of the blood drops.[2] When the knife recovered from Marquez's bedroom was tested, two contributors were identified, and neither Ms. Juarez nor Marquez could be eliminated as the source of the samples. Similarly, the sample from the knife indicated that the female contributor likely was Ms. Juarez.[3]

Marquez presented evidence that he was emotionally and physically abused as a child, suffered blackouts throughout his childhood, and, as he stated during his confession, he suffered a blackout during the murder.

The prosecution argued Marquez was guilty of felony murder because he committed the murder during a robbery. Marquez claimed he suffered a blackout when Ms. Juarez was killed and thus was legally unconscious and therefore not guilty of murder. He also argued the robbery ended when he had the blackout, thus he was not guilty of felony murder.

The jury found Marquez guilty and found the enhancements true.

---

[2]The expert testified that the frequencies that the DNA profile would appear in a randomly selected individual in the population were one in every 12 quintillion African-Americans, one in every 260 quadrillion Caucasians, and one in every 11 quadrillion Hispanics.

[3]The frequencies that the female DNA profile would appear in a randomly selected individual in the population were one in every 1.4 septillion African-Americans, one in every 6.4 sextillion Caucasians, and one in every 200 sextillion Hispanics.

Marquez argued at sentencing that the trial court should exercise its discretion and sentence him to 25 years to life instead of life without the possibility of parole. The trial court acknowledged its discretion pursuant to Penal Code section 190.5, subdivision (b), but chose the sentence of life without the possibility of parole.

## DISCUSSION

### I.    Suppression of the Confession

The trial court denied Marquez's motion to suppress his confession. Marquez asserts the trial court erred for two reasons. First, he argues the confession was inadmissible pursuant to *In re Wayne H.* (1979) 24 Cal.3d 595 (*Wayne H.*). Second, he asserts the confession was coerced and therefore inadmissible.

### A.  *Wayne H.*

*Wayne H.* involved an admission made by a minor during a Welfare and Institutions Code section 628[4] interview.

For perspective, we begin with section 625, which provides that a peace officer may take a minor into temporary custody when the officer has reasonable cause for believing the minor is a person described by section 601 or 602 (§ 625, subd. (a)) or if the officer has reasonable cause to believe the minor has violated an order of the juvenile court (*id.*, subd. (b)). A peace officer who takes a minor into temporary custody pursuant to section 625 has four options: (1) release the minor (§ 626, subd. (a)), (2) deliver the minor to the public or private agency that provides shelter and care for such minors (*id.*, subd. (b)), (3) release the minor after preparing and serving a notice to appear (*id.*, subd. (c)), or (4) "Take the minor without unnecessary delay before the probation officer … and deliver the custody of the minor to the probation officer" (*id.,* subd. (d)).

---

[4]All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

When a peace officer takes a minor into temporary custody and then delivers the minor to the probation officer, "the probation officer shall immediately investigate the circumstances of the minor and the facts surrounding his or her being taken into custody …." (§ 628, subd. (a).) The purpose of this investigation is to determine whether the minor should be detained, released to his or her parents, or put on some other type of supervised release. (*Ibid*.)

The investigatory requirement of section 628 was the focus of *Wayne H*. Wayne was detained because the police officer had reasonable cause to believe Wayne had committed an armed robbery and thus came within the provisions of section 602. When interviewed by the investigating detective, Wayne denied any involvement in the robbery. Wayne was then delivered to the probation officer.

The probation officer advised Wayne of his constitutional rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436. He then explained to Wayne that the results of the interview would bear on whether or not Wayne would be detained and whether juvenile fitness proceedings would be recommended. Wayne again denied any involvement in the robbery. When the probation officer informed Wayne that he would be recommending detention and a fitness hearing, Wayne admitted he committed the robbery. (*Wayne H., supra,* 24 Cal.3d at p. 598.)

At the subsequent adjudication hearing on the section 602 petition, the prosecutor introduced Wayne's admission. The Supreme Court concluded that Wayne's admission should have been excluded because "the subsequent use of statements made by a juvenile to a probation officer in a section 628 interview would frustrate important purposes of that statute, and of the Juvenile Court Law generally. We therefore hold that such statements are not admissible as substantive evidence, or for impeachment, in any subsequent proceeding to determine criminal guilt, whether juvenile or adult. Such statements may, of course, be admitted and considered in hearings on the issues of detention and fitness for juvenile treatment." (*Wayne H., supra,* 24 Cal.3d at p. 602.)

6.

The Supreme Court explained its reasoning:

"The interview required by a juvenile probation officer under section 628 is conducted in a nonaccusatorial setting. Contrary to the People's contention, the consultation is not analogous to police interrogation of an adult suspect. In fact, the section 628 interview has no counterpart in adult criminal proceedings in which the defendant confers with his probation officer only after conviction. [Citation.] The primary purpose of the section 628 interview, as the statutes make clear, is not to elicit evidence of guilt—the function of police questioning—but to assist the probation officer in deciding at the outset of the case whether the minor need be further detained pending a court hearing. [Citations.] This approach thereby serves a paramount concern of the Juvenile Court Law—that a minor be treated in the least restrictive means feasible under the circumstances [citations].

"While the purposes of such an interview are relatively restricted, however, the latitude given the probation officer in reaching a detention decision, and the effect of that decision on the minor, are substantial. The probation officer is required to investigate 'the circumstances of the minor *and the facts surrounding his being taken into custody*' in order to determine whether such detention is appropriate. [Citation.] Among the factors justifying detention are the risk of the defendant's flight and the possibility that his freedom will present a danger to person or property. [Citation.] The probation officer's decision may cause the minor to be detained for a period not exceeding 72 hours after arrest before he receives a court hearing on the detention issue. [Citation.]

"Under these circumstances, the minor's frank discussion of the offense may indicate that his involvement was innocent or secondary, or, more to the point, that he is cooperative and remorseful, and is therefore a good candidate for release pending further proceedings. Candor will assist the probation officer in discharging his statutory duty to determine the least restrictive feasible treatment of the minor. [Citation.] A free interchange between minor and officer should therefore be encouraged." (*Wayne H., supra,* 24 Cal.3d at p. 601.)

The facts surrounding Marquez's confession provide the fodder for his argument. As stated, investigating officers identified Marquez as a suspect in Ms. Juarez's murder. Marquez was walking on the street when the officers asked to speak to him. They quickly learned Marquez was on juvenile probation and summoned his probation officer

7.

to the scene. When the officers confirmed the terms of Marquez's probation included a search condition, they went from the scene of the initial detention to Marquez's house to conduct a search. Marquez was placed in the probation officer's vehicle and transported to his (Marquez's) house by the probation officer. Marquez remained in the vehicle during the search. When the search was completed, the investigating officers directed the probation officer to transport Marquez to the police station where he was interviewed. The probation officer was present and participated in the interview.

Marquez asserts custody was turned over to the probation officer when the probation officer arrived at the scene of the initial detention. He further asserts that it was the probation officer who told him he was being detained because he was in violation of his probation. He concludes that these facts suggest the detention was handled pursuant to sections 625 through 628, and the only logical interpretation of the facts is that the confession was part of the section 628 interview. We disagree.

The facts establish Marquez was a suspect in the murder of Ms. Juarez, and the purpose of the interview was to obtain information that would either incriminate or exonerate him in that murder. The assertion that some hypothetical individual in the same situation would have thought the interrogation was being conducted to ascertain whether he or she should be released or detained is irrelevant. There is no indication that Marquez thought the interview was being conducted for that purpose, nor was that the investigating officer's purpose in conducting the interview. Indeed, as Marquez eventually acknowledged, when the investigating officer approached him on the street, Marquez knew he was a detective and "had a feeling" he was being investigated for Ms. Juarez's murder.

Nor did the investigating officer ever consider the interview to be pursuant to section 628. Even the probation officer, who was familiar with section 628 interviews, testified that this was not a section 628 interview, nor was it ever intended to be a section 628 interview.

8.

Also, there was no indication in the interview that it was being conducted for the purpose of determining whether Marquez should be detained or released to his parents. We have listened to the entire recorded interview and have reviewed the transcript. It is clear the purpose of the interview was the investigation of Ms. Juarez's murder. On page nine of the 54-page transcript, the investigating officer informed Marquez that the reason he was being detained was "beyond important. Do you understand, for you? Because we are dealing with something that's very serious." Even if there were a possibility that Marquez thought he was being questioned because he was wearing gang attire, in violation of the terms of his probation, this statement unquestionably let Marquez know he was being investigated for a serious crime.

Marquez's detention for a probation violation also is irrelevant. Because there was reasonable cause to believe he was in violation of his probation, the investigating officers legally could detain Marquez, even if they did not have probable cause to arrest him for Ms. Juarez's murder. When Marquez asked why he was being detained, he honestly was told it was because of the probation violation. Simply because he was detained for a violation of probation, however, does not convert the interrogation into a section 628 interview.

It is abundantly clear that the only purpose of the interview was to investigate Ms. Juarez's murder. The investigating officer, the probation officer, and even Marquez knew the interview was related to Ms. Juarez's murder. Whether we review the issue using a subjective or objective standard, there is no question that this was not a section 628 interview. Accordingly, the trial court properly denied Marquez's motion to suppress the interview on this ground.

### B. Coercion

Marquez also contends the interview was coerced and therefore should have been suppressed. He bases this argument on the presence of his probation officer during the interrogation.

9.

We begin with the well-settled rules relating to coercive interrogations.

"The admission at trial of a defendant's statements made involuntarily to government officials violates the defendant's federal due process rights under the Fifth and Fourteenth Amendments. [Citation.] Similarly, a defendant must be advised of his or her *Miranda* rights, and must make a valid waiver of these rights, before questioning begins or any statements resulting from interrogation can be admitted. [Citations.]

"When a defendant challenges the admission of his or her statements on the ground they were involuntarily made, the prosecution must prove by a preponderance of the evidence the statements were, in fact, voluntary. [Citation.] A statement is involuntary if it is 'not "'the product of a rational intellect and a free will.'"' [Citation.] The court in making a voluntariness determination 'examines "whether a defendant's will was overborne" by the circumstances surrounding the giving of a confession.' [Citation.] Coercive police tactics by themselves do not render a defendant's statements involuntary if the defendant's free will was not in fact overborne by the coercion and his decision to speak instead was based upon some other consideration. [Citations.] The determination whether the authorities improperly coerced a defendant's statements involves an evaluation of the totality of the circumstances, including the nature of the interrogation and the circumstances relating to the particular defendant. [Citation.]

"The same inquiry applies when a court evaluates the voluntariness of a *Miranda* waiver. [Citation.] Such a waiver must be knowingly and intelligently made, meaning that the defendant must have been capable of freely and rationally choosing to waive his or her rights and speak with the officers. [Citation.] [¶] … [¶]

"On appeal, we review independently the trial court's legal determinations of whether a defendant's statements were voluntary [citation], whether his *Miranda* waivers were knowingly, intelligently, and voluntarily made [citation], and whether his later actions constituted an invocation of his right to silence [citation]. We evaluate the trial court's factual findings regarding the circumstances surrounding the defendant's statements and waivers, and '"accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence."' [Citations.]" (*People v. Rundle* (2008) 43 Cal.4th 76, 114-115, overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421.)

This standard of review highlights the first reason we must reject Marquez's argument. We review the trial court's factual findings to determine if they are supported by substantial evidence. The trial court did not make any factual findings on this issue because Marquez failed to present this argument to the trial court. Nor was the prosecution given the opportunity to demonstrate the confession was voluntary. Accordingly, the argument is forfeited. (*In re Sheena K.* (2007) 40 Cal.4th 875, 880-881; *People v. Michaels* (2002) 28 Cal.4th 486, 512 (*Michaels*).)

Even if we were to consider the argument on the merits, we would reject it. "A statement is involuntary if it is not the product of "'a rational intellect and free will.'" [Citation.] The test for determining whether a confession is voluntary is whether the defendant's 'will was overborne at the time he confessed.' [Citation.] "'The question posed by the due process clause in cases of claimed psychological coercion is whether the influences brought to bear upon the accused were 'such as to overbear [defendant's] will to resist and bring about confessions not freely self-determined.' [Citation.]" [Citation.] In determining whether or not an accused's will was overborne, "an examination must be made of 'all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.' [Citation.]" [Citation.]' [Citation.] [¶] A finding of coercive police activity is a prerequisite to a finding that a confession was involuntary under the federal and state Constitutions. [Citations.] A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence. [Citation.] Although coercive police activity is a necessary predicate to establish an involuntary confession, it 'does not itself compel a finding that a resulting confession is involuntary.' [Citation.] The statement and the inducement must be causally linked. [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 404-405.)

Marquez's argument, in essence, is that because his probation officer was present, and he had a lengthy history of interacting with Marquez in the course of Marquez's

11.

probation, and Marquez was required to communicate openly with his probation officer, the resulting confession was involuntary. Also, Marquez's documented history of low intelligence, poor educational background, and "impaired communication skills" made Marquez susceptible to manipulation, further demonstrating the confession was involuntary.[5]

Marquez fails to provide any authority that supports his argument. The closest he comes to citing relevant authority are the cases that direct us to look at all the circumstances surrounding the confession when evaluating whether the confession was voluntary. (See, e.g., *Rachlin v. United States* (8th Cir. 1983) 723 F.2d 1373.) But Rachlin claimed his confession was involuntary because he was promised leniency in exchange for confessing. The appellate court rejected the claim because the record demonstrated there were no implied promises, coercive tactics, or threats. (*Id*. at p. 1378.) Statements made in the hope of leniency are not the product of coercion and thus are voluntary. (*Ibid*.)

Marquez cannot point to any threats or implied promises of leniency. At the beginning of the interview, Marquez demonstrated his willingness to deny any involvement in the murder. While his probation officer and the investigating detective repeatedly encouraged Marquez to tell the truth, neither suggested nor implied that Marquez was required to answer all questions posed to him simply because he was on probation. At no time was Marquez told that he would have to answer all questions or have his probation revoked. Moreover, encouraging a suspect to be truthful is not coercion.

---

[5]We are uncertain to what Marquez is referring when claiming "impaired communication skills." In our review of the interrogation, Marquez did not demonstrate any difficulty understanding the questions posed to him or responding to those questions.

The circumstances surrounding the interrogation establish that the presence of the probation officer was not a coercive tactic. Marquez primarily was interrogated by the investigating detective. Marquez was told that he was being questioned about "something that's very serious." Undoubtedly, Marquez knew that wearing gang attire was not "very serious." Finally, Marquez was informed of his constitutional rights pursuant to *Miranda*. These facts put Marquez on notice that he was being interrogated about a serious crime, despite his probation officer being present during the interrogation.

The recording of the confession further confirms no coercive tactics were used during the interrogation. As stated above, initially Marquez denied any involvement in Ms. Juarez's murder. The investigating officer, who clearly led the interrogation, then questioned Marquez about his movements during the relevant times. When the investigating officer repeatedly informed Marquez that independent evidence established he was lying, Marquez repeatedly changed his story, only to be informed that the independent evidence also established the new story was untrue. Marquez, apparently realizing he could not avoid prosecution, then became very emotional and confessed to the murder.

It appears, as Marquez stated when he talked to his mother after confessing, the confession was the result of Marquez's desire to clear his conscience. He repeatedly stated he was sorry for what had occurred, and he was incredulous that he had murdered Ms. Juarez. Such statements reflect a guilty conscience and not a coercive environment. Accordingly, we reject Marquez's claim of coercion.

II. **Suppression of Evidence Obtained During the Search of Marquez's Residence**

When the investigating officer initially encountered Marquez, he learned that Marquez was on probation and the terms of probation included a search condition that allowed any peace officer to search Marquez's residence at any time without cause. The investigating officers searched Marquez's residence pursuant to this condition before he

was interrogated. The knife used to murder Ms. Juarez was discovered under Marquez's mattress.

Marquez concedes he was subject to a probation search condition, but asserts the search violated his Fourth Amendment rights because the investigating officers did not have a reasonable suspicion Marquez was involved in criminal activity at the time of the search.

Marquez cites *United States v. Knights* (2001) 534 U.S. 112 (*Knights*) as authority for the proposition that a police officer must have a reasonable suspicion of criminal activity before he may search a probationer's residence pursuant to a probation search condition.

In candor, Marquez acknowledges that *Knights* is not directly on point. The Supreme Court held in *Knights* that under the totality of the circumstances in that case, a search conducted pursuant to a probation search condition did not violate the Fourth Amendment because the officers had a reasonable suspicion that Knights was involved in criminal activity. (*Knights, supra,* 534 U.S. at p. 122.) Since the search was lawful under the totality of the circumstances using the general approach to Fourth Amendment issues, the Supreme Court did not reach the issue of whether the probation condition was a complete waiver of his Fourth Amendment rights. (*Knights,* at p. 118.)

Marquez also concedes that the California Supreme Court has held that a probation search condition does not violate the Constitution, even if the search is conducted without a reasonable suspicion that the probationer was engaged in criminal activity, so long as the search is not arbitrary, capricious, or harassing. (*People v. Reyes* (1998) 19 Cal.4th 743, 752.) There is no claim here that the search was arbitrary, capricious, or harassing. Since we are bound by Supreme Court precedent, we reject Marquez's argument. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

14.

### III.   *Marsden* Motions

Marquez made four motions pursuant to *Marsden*, all of which were denied.  He argues the trial court erred when it denied his motions.

#### *The Applicable Law*

In *Marsden*, the Supreme Court held that a "judge who denies a motion for substitution of attorneys solely on the basis of his courtroom observations, despite a defendant's offer to relate specific instances of misconduct, abuses the exercise of his discretion to determine the competency of the attorney.  A judicial decision made without giving a party an opportunity to present argument or evidence in support of his contention 'is lacking in all the attributes of a judicial determination.'  [Citation.]" (*Marsden, supra,* 2 Cal.3d at p. 124.)

Decisions since *Marsden* now guide trial courts in the exercise of discretion when a defendant seeks to replace his appointed counsel.  "Once a defendant is afforded an opportunity to state his or her reasons for seeking to discharge an appointed attorney, the decision whether or not to grant a motion for substitution of counsel lies within the discretion of the trial judge.  The court does not abuse its discretion in denying a *Marsden* motion '"unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel."'  [Citations.] Substantial impairment of the right to counsel can occur when the appointed counsel is providing inadequate representation or when 'the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citation].'  [Citations.]" (*People v. Clark* (2011) 52 Cal.4th 856, 912 (*Clark*).)

#### *The* **Marsden** *Hearings*

We now turn to Marquez's four *Marsden* motions.

Marquez's first motion was made on November 30, 2009.  Marquez informed the trial court that he did not feel appointed counsel was motivated to defend him, and that he

15.

(Marquez) did not understand what was happening in the case. Marquez admitted he knew he was charged with murder, was present at the preliminary hearing, and appointed counsel had discussed the evidence against him. Appointed counsel then explained the numerous visits he had had with Marquez, the topics discussed, as well as the other things that had been done in preparing Marquez's defense. The trial court found no basis for relieving counsel, concluding that appointed counsel was making diligent efforts to defend Marquez.

The second motion was made on June 8, 2010. Marquez again asserted appointed counsel had not kept him informed about the progress of the case and claimed he did not understand much of the court proceedings. He claimed appointed counsel had not been able to explain the proceedings to him. He also claimed he had become upset with appointed counsel "a few times." Marquez stated he did not trust appointed counsel and could not work with him.

Appointed counsel admitted he had attempted to explain the procedures but that Marquez did not appear to understand. This *Marsden* hearing occurred approximately one month after appointed counsel declared a doubt about Marquez's competency to understand the proceedings because of a developmental disability, at which time the trial court suspended criminal proceedings and instituted civil proceedings to determine Marquez's competency. The issue of competency was set for a jury trial shortly before this *Marsden* motion was heard. The trial court found no grounds to replace appointed counsel.

The third motion was heard on October 27, 2010, while competency proceedings were still pending. Marquez's first complaint was that appointed counsel had failed to provide him with some unspecified documents related to the case in what Marquez felt was a timely fashion. His second complaint was that appointed counsel informed him there were no viable defenses and there was nothing that could be done to defend him. Appointed counsel suggested Marquez plead guilty and accept a sentence of life in

16.

prison. Marquez claimed he was unwilling to work with appointed counsel and did not trust him.

Appointed counsel stated he had discussed the possibility Marquez might decide to plead guilty to the murder without the special circumstance but denied telling Marquez he must plead guilty. He also denied ever telling Marquez the case was an automatic loss or that Marquez was going to be convicted. He also asserted Marquez had been provided with all relevant documents, but no photographs had been provided yet because of a technical problem that prevented printing the photographs.

Marquez responded by stating he felt appointed counsel was not prepared adequately. The trial court found no merit to the motion, explaining its reasoning to Marquez.

The final motion was made on August 10, 2011, approximately two months after a jury found Marquez competent to stand trial. Marquez began by complaining that appointed counsel had failed to respond to his (Marquez's) requests for visits in a timely manner. When visits occurred, often they became heated. Appointed counsel also left during a meeting before Marquez was finished, a tactic Marquez admitted he also had utilized. On one occasion appointed counsel struck a table with his hand in frustration. Appointed counsel also took two to three months to provide requested documents, failed to provide police reports prepared by detectives who had relatively minor roles in the case, and refused to file a motion to recuse the judge appointed for trial on the basis that the judge was prejudiced against Marquez. Marquez asserted he was not going to get adequate legal representation from appointed counsel, he was not going to get a fair trial, he was not going to meet with appointed counsel in the future, and he would not come to the courtroom in the future.

Appointed counsel explained that a Code of Civil Procedure section 170.6 motion had been filed prior to the matter being assigned to the trial judge, and appointed counsel did not think there were grounds to make a motion to remove the trial judge for cause.

17.

He also admitted that on occasion he did not respond to requests for a meeting for two to three weeks, but denied that it took him two to three months to visit with Marquez. He also admitted some discussions had been acrimonious and there had been difficulties between Marquez and himself, but those difficulties originated with Marquez. Oftentimes Marquez would blame appointed counsel for his present circumstance. Appointed counsel also denied withholding any documents from Marquez, but admitted that he had slammed his hand on the table in frustration on one occasion.

The trial court began by explaining to Marquez that it was not prejudiced against him and had no personal interest in the outcome of the case. The trial court also explained that Marquez had a responsibility to cooperate with his appointed counsel, and appointed counsel had an obligation to represent Marquez zealously. The trial court informed Marquez that appointed counsel had been making novel and interesting arguments demonstrating he had given the case great thought and preparation. Finally, the trial court concluded that nothing Marquez stated would justify replacing appointed counsel at this time.

*Analysis*

Marquez does not suggest he received inadequate representation, but instead argues his right to the assistance of counsel was impaired substantially because he and appointed counsel were embroiled in an irreconcilable conflict. According to Marquez, the "increasingly acrimonious and emotional nature of [his] meetings with his attorney prevented [him] from trusting and working with [appointed counsel]," thus destroying the attorney-client relationship. We disagree.

The record demonstrates Marquez was confrontational not only with appointed counsel, but also with the trial court. The record also suggests Marquez disagreed with appointed counsel's tactical choices, specifically the choice to litigate his competence to stand trial. Finally, the record suggests Marquez refused to accept responsibility for the dire circumstances in which he found himself. The combination of these factors caused

18.

Marquez to act out in the only way he could -- by attacking appointed counsel and complaining about trivial matters (e.g., not getting documents as quickly as he would like and overreacting to discussions regarding a plea bargain).

Marquez was not entitled to new appointed counsel simply because he disagreed with trial tactics, refused to cooperate with counsel, did not trust counsel, or refused to communicate with counsel in a respectful manner.  (*Clark, supra,* 52 Cal.4th at p.  918; *Michaels, supra,* 28 Cal.4th at p. 523; *People v. Welch* (1999) 20 Cal.4th 701, 728-729.)  As explained in *People v. Jones* (2003) 29 Cal.4th 1229, 1246, "If a defendant's claimed lack of trust in, or inability to get along with, an appointed attorney were sufficient to compel appointment of substitute counsel, defendants effectively would have a veto power over any appointment, and by a process of elimination could obtain appointment of their preferred attorneys, which is certainly not the law.  [Citations.]"

In sum, we agree with the trial court that there was not an irreconcilable breakdown in the attorney-client relationship.  Accordingly, the trial court did not abuse its discretion when it denied Marquez's motions for a new attorney.

## IV.    Cruel and Unusual Punishment

The United States Supreme Court has held that a sentence of life in prison without the possibility of parole for a nonhomicide offense violates the Eighth Amendment's prohibition against cruel and unusual punishment if the offender was under 18 when the offense was committed.  (*Graham v. Florida* (2010) 560 U.S. 48.)

In *Miller, supra,* 567 U.S. ___ [132 S.Ct. 2455], the Supreme Court further held that a *mandatory* sentence of life in prison without the possibility of parole constituted cruel and unusual punishment for homicide offenses if the offender was under 18 at the time the homicide was committed.  Both *Miller* and *Graham* concluded that because juveniles had a diminished culpability and greater prospects for reform, they were different from adults and less deserving of the most sever punishments.  (*Miller,* at p. ___ [132 S.Ct. at p. 2464].)

19.

These concepts stem from scientific evidence that children (1) lack maturity and have an underdeveloped sense of responsibility, which leads to recklessness, impulsivity, and heedless risk taking, (2) are more susceptible to negative influences and outside pressure from family and peers, (3) have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings, and (4) cannot easily be identified as irretrievably depraved because their character is not as well formed as an adult's and their traits and/or character are more malleable than those of adults. (*Miller, supra,* 567 U.S. at p. ___ [132 S.Ct. at p. 2464].) These characteristics render the penological goals of retribution and deterrence unjustified. (*Id*. at p. ___ [132 S.Ct. at p. 2465].) Since a child is less blameworthy, the strength of the retribution rationale is reduced. (*Ibid.*) And because a child is less likely to consider potential punishment when acting, the strength of the deterrence justification is reduced. (*Ibid.*)

The Supreme Court summarized its conclusions as follows: "So *Graham* [*v. Florida, supra,* 560 U.S. 48] and *Roper* [*v. Simmons* (2005) 543 U.S. 551] and our individualized sentencing cases alike teach that in imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult. To recap: Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. [Citations.] And finally, this mandatory

20.

punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." (*Miller, supra,* 567 U.S. at p. ___ [132 S.Ct. at p. 2468].)

The Supreme Court concluded with its holding and future directions. "We therefore hold that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders. [Citation.] By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment. Because that holding is sufficient to decide these cases, we do not consider [defendants'] alternative argument that the Eighth Amendment requires a categorical bar on life without parole for juveniles, or at least for those 14 and younger. But given all we have said in *Roper, Graham*, and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citations.] Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Miller, supra,* 567 U.S. at p. ___ [132 S.Ct. at p. 2469].)

California's sentencing scheme does not suffer from the same constitutional deficiency as the statutes in *Miller*. The sentence of life in prison without the possibility of parole was not mandatory because Penal Code section 190.5, subdivision (b) gave the trial court discretion to impose a sentence of 25 years to life.

The trial court was aware of this discretion and chose not to exercise it.[6]  At sentencing, the trial court explained there were mitigating factors, including Marquez's "horrific childhood," which included physical abuse, emotional abuse, and abandonment. The trial court, however, observed that Marquez was exposed to counseling to treat the issues caused by his upbringing.  It noted Marquez's prior criminal record involved minor issues that appeared to be the product of his upbringing.  It recognized that Marquez was 17 at the time the offense was committed, he had expressed remorse for the crime, and he had accepted that he was going to be punished severely for his actions.

The trial court, however, noted the victim did nothing to provoke Marquez, who ambushed the victim in the hope of robbing her.  The trial court observed that Marquez brought a knife to the scene and noted the viciousness of the crime (19 stab wounds) that "clearly evidenced an intent to kill."  Finally, the trial court recognized that rehabilitation was one of the legislative goals when it established the punishment for a crime, but "[r]ehabilitation in these matters is the least weighty consideration.  It's an important one, but it's the least weighty."  It then chose the term of life without the possibility of parole.

Neither party provides any illumination to what we see as the real issue in this case:  Is this one of the uncommon cases where it is appropriate to sentence a juvenile to the harshest possible penalty?  (*Miller, supra,* 567 U.S. at p. ___ [132 S.Ct. at p. 2469].) To answer that question, one must consider the factors set forth in *Miller*, i.e., (1) Marquez's age, immaturity, impetuosity, and failure to appreciate the risks and consequences of his actions, (2) Marquez's family and home environment, (3) the circumstances of the offense, including peer pressures that may have affected him,

---

[6]The probation report provided no assistance to the trial court as the probation department failed to recognize the trial court had discretion to impose a sentence of 25 years to life instead of life without the possibility of parole.

(4) how the "incompetencies associated with youth" affected his conviction, and (5) the possibility of rehabilitation. (*Id.* at p. ___ [132 S.Ct. at p. 2468].)

Because *Miller* had not yet been decided, the trial court sentenced Marquez without fully considering the implications of the Eighth Amendment. Undoubtedly, the trial court considered some of the *Miller* factors. It is clear, however, other factors were not considered or were found to have little weight in the sentencing decision, even though *Miller* suggests otherwise. For these reasons, we feel compelled to reverse the judgment and remand the matter for resentencing to satisfy the constitutional concerns raised by *Miller*.

On remand, the trial court must give thorough consideration to the *Miller* factors, many of which readily appear in this record. A review of the record reveals numerous factors that must be considered, including (1) the virtual unanimous conclusion of the five mental health professionals that Marquez suffers borderline intellectual functioning, substance abuse, and psychiatric disorders, including posttraumatic stress disorder, and schizoaffective disorder bipolar type, (2) the long history of psychiatric treatment and medication, (3) the physical and emotional abuse thoroughly set forth in the psychiatric evaluations that undoubtedly contributed to the substance abuse and psychiatric diagnosis, (4) the motive for the crimes (to get money for clothes and because the victim disrespected him previously), suggesting peer pressure may have influenced his actions, (5) the strong evidence of the "incompetencies associated with youth" that appear in the record including, (a) Marquez refusing to request the assistance of counsel, even though he was involved in a murder, (b) Marquez providing the only evidence that allowed the jury to find the special circumstance of robbery to be true, (c) Marquez repeatedly confronting and refusing to assist his attorney, thus hampering his defense, and (d) Marquez refusing to attend most of the trial despite the encouragement of the trial court and counsel to do so, and (6) the possibility of rehabilitation, including Marquez's remorse, if any, and potential for growth and change.

Only after these factors, and any others the trial court identifies, are thoroughly examined can a reasoned sentencing decision be made that will satisfy constitutional concerns.  The trial court cannot be criticized for failing to anticipate the Supreme Court's decision in *Miller*, but to meet constitutional concerns the sentencing decision must be informed by *Miller*.  Remand will permit these concerns to be addressed fully.[7]

## DISPOSITION

The judgment is reversed and the matter is remanded to the trial court for resentencing.  The conviction is affirmed in all other respects.


_____
CORNELL, Acting P.J.

I CONCUR:


_____
GOMES, J.

---

[7]Marquez also argues the abstract of judgment improperly reflects a parole revocation fine that was not imposed and requests that a corrected abstract of judgment be issued.  The People concede the error.  Since the judgment is being reversed, however, a new abstract of judgment will be issued.  The issue can be addressed at the resentencing hearing.

**Poochigian, J., Concurring.**

I concur in the majority opinion but write separately to emphasize the scope of the sentencing court's discretion upon remand.

In *Miller v. Alabama* (2012) 567 U.S. ___ [132 S.Ct. 2455] (*Miller*), the United States Supreme Court, in a five-to-four decision, held that *mandatory* sentences of life without the possibility of parole for minors violate the Eighth Amendment prohibition against cruel and unusual punishment. *Miller* further emphasizes the necessity of "individualized sentencing" that takes into account such facts as the juvenile's age, environment, peer pressure, etc.

The *Miller* court held, "Our decision does not categorically bar a penalty for a class of offenders or type of crime – as, for example, we did in *Roper* [*v. Simmons* (2005) 543 U.S. 551] or *Graham* [*v. Florida* (2010) 560 U.S. 48]. Instead, it mandates only that a sentencer follow a certain process – considering an offender's youth and attendant characteristics – before imposing a particular penalty." (*Miller, supra,* 567 U.S. at p. ___ [132 S.Ct. at p. 2471].)

California is not among the jurisdictions that have a mandatory life without possibility of parole statute for homicides committed by minors – thus, reversal is not required under *Miller.* Indeed, the sentencing court in this case was well aware of its statutory sentencing discretion, addressed the existence of mitigating factors, and chose to impose the term of life without the possibility of parole. On this record, it would seem arguable that a remand for resentencing would be unnecessary. As noted by the majority opinion, however, the issues arising from *Miller* are currently pending before the California Supreme Court, thus making remand the proper course.

As the majority in the instant case notes, *Miller* establishes a requirement for the sentencing court to weigh characteristics – of the crime and the defendant – in reaching a

decision to impose a sentence of life without the possibility of parole on a juvenile offender.

The *Miller* court did state that, "[We] *think* appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." (*Miller, supra,* 567 U.S. at p. ___ [132 S.Ct. at p. 2469], italics added.)  It is not clear whether the court intended to convey direction, hope or prediction.

*Miller* dictates that the sentencing court must weigh certain relevant characteristics.  However, my concern is that enumeration of very specific mitigating elements of evidence in the instant case and general charge to the sentencing court may seem prescriptive and thus construed as direction to impose a lesser sentence on remand.  In the absence of further guidance from the California Supreme Court, I would simply call upon the trial court to exercise its discretion by engaging in the weighing procedure described by the United States Supreme Court in *Miller*.

_____

Poochigian, J.